[No. G037275. Fourth Dist., Div. Three. Nov. 29, 2007.]

Q-SOFT, INC., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
REZA MAHALLATY et al., Real Parties in Interest.

## COUNSEL

Jones & Mayer, Harold W. Potter and Michael R. Capizzi for Petitioner.

No appearance for Respondent.

No appearance for Real Party in Interest Azita Mahdavi-Cummings.

Law Offices of David N. Thatcher & Associates and David N. Thatcher for Real Party in Interest Reza Mahallaty.

John R. Cummings, in pro. per.; and Roger S. Shafer for Real Party in Interest John R. Cummings.

Tony Rackauckas, District Attorney, and William Overtoom, Deputy District Attorney, for Real Party in Interest the People.

## OPINION

**SILLS, P. J.**—The "Freeze and Seize Law" (Pen. Code, § 186.11)[1] is designed to provide restitution to white collar crime victims from assets under the convicted criminal's control. Here, a corporate victim claims that the trial court misapplied the "innocent spouse" exception in the Freeze and Seize Law by permitting the embezzler's former husband to retain his

---

[1] All further statutory citations are to the Penal Code, except as noted.

one-half community interest in the family residence, and by further permitting the embezzler's current husband to retain most (but not all) of his community interest.

Ignored by the parties is the central fact that a substantial amount of the community interests already have been distributed to the corporation. We issue a writ of mandate to give the trial court the opportunity to clarify whether its distribution orders of August 3, 2004 and July 26, 2005, will accord the corporation the full restitution to which it is entitled under the law. If yes, the distribution orders have been appropriately made. If no, the trial court should make further findings as to the extent of the shortfall, and whether the spouses legitimately acquired their community interests in the remaining assets that would be used to satisfy any unpaid difference.

I

Q-Soft, Inc., a computer consulting firm, employed Azita Mahdavi-Cummings (Wife) to take care of its financial records. She wrote the company checks and administered its cash advance program. Between 1995 and 1998, Wife embezzled substantial sums from Q-Soft, failed to pay its taxes, and destroyed financial records. She deposited nearly three times her salary into her personal bank accounts.

Wife was twice married. In 1985, she married her first husband, real party in interest Reza Mahallaty. They separated in 1993 and divorced in 1997. Their Trabuco Canyon residence was listed in the dissolution judgment as a community property asset confirmed to both parties as tenants in common.

In 1997, Wife married her current husband, real party in interest John R. Cummings. They owned a residence in Dove Canyon. Title to this residence was vested in "Azita Mahdavi-Cummings, a married woman and John R. Cummings, a married man."

Wife's embezzlement began during her legal separation from Mahallaty and continued through her marriage to Cummings. There is no evidence that either man knew or was involved in the crimes.

Wife was arrested in 1999. The trial court thereupon issued an order under the Freeze and Seize Law, freezing various bank accounts held in her name, as well as the Trabuco Canyon and Dove Canyon residences. In 2002, a court-appointed receiver sold both properties and deposited the funds in interest-bearing bank accounts. The Trabuco Canyon sale netted $155,330, and the Dove Canyon sale netted $538,201.

In 2000, at her preliminary hearing, Wife signed a *Tahl* form in which she admitted embezzling over $250,000 from Q-Soft. (*In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] (*Tahl*).) However, Wife subsequently withdrew the plea, and it was not introduced at her criminal trial.

In February 2004, a jury convicted Wife of multiple counts of grand theft, forgery, and aggravated white collar crime. She was sentenced to four years in prison. A different panel of this court affirmed the criminal conviction. (*People v. Mahdavi* (Mar. 21, 2006, G033693) [nonpub. opn.].)

The parties submitted their claims under the Freeze and Seize Law in March 2004. The receiver's report, filed April 2, 2004, determined that Q-Soft was entitled to a total restitution of $360,530, which sum included $177,000 as the value of the stolen funds, plus interest from the date of loss, attorney fees and collection costs, accounting fees and auditor fees.[2]

Q-Soft objected, submitting a revised calculation for $588,378, including a higher amount ($261,876) as the value of the stolen funds. This was the stated amount in Wife's *Tahl* form "when she acknowledged that she had stolen money from Q-Soft." Opposing counsel objected to use of the *Tahl* figures because "[t]he fact that [Wife] withdrew the plea I think should indicate that she did not agree with the amount of the restitution."

On April 9, 2004, the court held a hearing on the restitution claims. Q-Soft, Mahallaty and Cummings were each represented by counsel.

On April 21, 2004, the court ruled in favor of Mahallaty and Cummings and against Q-Soft. The court determined that both Mahallaty and Cummings were "innocent spouses" under section 186.11. The court rejected Q-Soft's reliance on the *Tahl* form, finding "the amount of restitution was determined from the trial and not from the guilty plea that the defendant had previously entered before she was convicted by a jury. [¶] A defendant, in entering a guilty plea may have been willing to pay more restitution to cut down the amount of jail time." The court adopted the distribution plan proposed in the receiver's report of April 2, 2004, and directed the preparation of an appropriate order. On May 13, 2004, the court issued an order for restitution directing that Q-Soft be paid the sum of $231,221, plus interest. On the same date, the court issued a separate order that the Franchise Tax Board be paid the sum of $59,312 in restitution, plus 10 percent interest. The People applied for an abstract of judgment on the Franchise Tax Board's behalf.

---

[2] The receiver's calculations broke down as follows: (1) $177,000 for stolen funds, (2) $10,000 auditor fees, (3) $31,941 accounting fees, (4) $11,803 attorney fees, and (5) $129,786 interest.

The receiver submitted a fifth status report in July 2004. The receiver calculated Q-Soft's restitution claim at $366,976, including interest as of June 30, 2004. Interest thereafter would continue to accrue at $23,122 each year, or about $63 per day. The receiver proposed that Q-Soft and Mahallaty receive $77,665 as their equal shares to the proceeds of the sale of the Trabuco Canyon property, and that Q-Soft and Cummings receive $269,100 as their equal shares to the proceeds of the sale of the Dove Canyon property.

Q-Soft asked the court to stay distribution of the one-half interest in the funds to either Mahallaty or Cummings pending a hearing whether Wife's illegal activities benefited the community.

On August 3, 2004, the court signed its distribution order on the receiver's report. The court granted Q-Soft's request to stay the distribution of funds to either Mahallaty or Cummings. The court, however, ordered that Q-Soft receive its 50 percent share from the proceeds of each sale, for a total distribution of $346,765. A proof of service of the August 3 distribution order was filed on August 10, 2004.

The parties submitted additional briefings in the spring of 2005, and the court held further hearings in July 2005.

On July 26, 2005, the court issued its further order on distribution of assets held by the receiver. The court noted there was "ample evidence" of commingling of funds from Wife to Cummings, but no such apparent evidence of commingling with Mahallaty because "there were fewer transac-tion[s] . . . ." The court ordered that all remaining funds from the sale of the Trabuco Canyon property be distributed to Mahallaty. The court, however, adjusted the distribution order as to Cummings by requiring the receiver to pay Q-Soft an additional $49,573 in restitution from the proceeds from the sale of the Dove Canyon property.

In August 2005, Q-Soft filed a notice of appeal from the trial court's July 26 order. The following year, after Q-Soft's opening brief had been filed, the People (represented by the Attorney General) moved to dismiss the appeal because "there is no statutory basis for an appeal by a victim from a criminal proceeding . . . ."

We dismissed the appeal without prejudice upon the prompt filing of a petition for writ of mandate. (*People v. Mahdavi* (G035978), app. dism. June

1, 2006.) After Q-Soft filed such a petition, we issued a temporary stay and an order to show cause and took judicial notice of the appellate record in the dismissed appeal.

## II

█ Section 186.11, as our Supreme Court has recently explained, is designed to promote the state constitutional rights of crime victims to the payment of restitution from " 'persons convicted of the crimes for losses they suffer.' " (*People v. Semaan* (2007) 42 Cal.4th 79, 86 [64 Cal.Rptr.3d 1, 163 P.3d 949] (*Semaan*), citing Cal. Const., art. I, § 28, subd. (b); see also *People v. Bufford* (2007) 146 Cal.App.4th 966, 971 [53 Cal.Rptr.3d 273] [crime victim's theoretical right to pursue civil remedy against wrongdoer should not be allowed to substitute for her "constitutional 'right to restitution' "].)

When a person has been charged under section 186.11 with an aggravated white collar crime enhancement, "any asset or property that is in the control of that person . . . may be preserved by the superior court in order to pay restitution and fines imposed pursuant to this section." (§ 186.11, subd. (e)(1).) There is no requirement that the seized assets be traceable to or the actual product of any criminal activity. (*Semaan, supra,* 42 Cal.4th at pp. 86–87.)

█ Where a defendant is *convicted* of a section 186.11 offense, the trial court is required to make a finding at that time as to what portion of the frozen property or assets, if any, may be levied upon to pay fines or victim restitution. (§ 186.11, subd. (g)(5).) Victims are entitled to "full restitution" for economic loss suffered as a result of the defendant's conduct "based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) The restitution order must be sufficient "to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: [¶] (A) Full or partial payment for the value of stolen or damaged property. . . ." (§ 1202.4, subd. (f)(3)(A).)

Q-Soft already has received the sum of $346,765 from Wife's share of the Trabuco Canyon and Dove Canyon properties in the August 3, 2004 distribution order. In response to Q-Soft's objection that this sum was insufficient,

Judge Kreber issued a new order on July 26, 2005, that Q-Soft receive an extra $49,573 in restitution. These moneys would come out of Cumming's 50 percent share in the community proceeds in the Dove Canyon properties. Judge Kreber, however, declined to grant Q-Soft's request "to order distribution of all remaining funds to Q-Soft."

Q-Soft avers in its petition that it still is $241,613 "shy of full restitution." Q-Soft apparently computes this shortfall from its restitution claim for $588,378. Cummings, in contrast, claims in his return that Q-Soft's restitution claim now has been "fully paid."

■ The July 26, 2005 order does not explain why Judge Kreber denied Q-Soft's request for distribution of all remaining funds. Q-Soft presumes that it was because of the court's previous determination that Mahallaty and Cummings were "innocent spouses." Yet, the court ordered the "innocent" spouse Cummings to pay an additional $49,573 out of his 50 percent community share. It is unclear whether the court did so to provide Q-Soft the *full amount* of restitution to which it was entitled as a crime victim under section 1202.4.

Here, we note a critical omission in Q-Soft's chronology of pertinent events: the trial court's restitution order of May 13, 2004. As previously indicated, it appears that Judge Kreber considered and *rejected* Q-Soft's reliance on Wife's *Tahl* form to value the amount of the stolen funds, adopting instead the receiver's lower estimate ($177,000 rather than $261,876). This determination is formalized in the court's restitution order of May 13, 2004. As of June 30, 2004, the receiver calculated the total sum due Q-Soft (including interest) at $366,976—not the $588,378 which Q-Soft seeks.

Q-Soft's writ from the July 26, 2005 distribution order does not challenge either the facts underlying this determination or the procedural fairness of the restitution proceedings. In its petition for rehearing, Q-Soft complains that it "continues to be victimized." Q-Soft says that it was thrust into the restitution proceedings with limited rights, including "no right to demand production of documents, no right to take depositions, no right to serve interrogatories, no right to request admissions and no effective means of preventing the disappearance of the only known assets if they are returned to [real parties in interest]."

Q-Soft was represented by counsel below, and received notice of the receiver's reports and hearing dates. There were evidentiary submissions by the parties, an adversarial hearing on April 9, 2004, and a written, signed and file-stamped restitution order of May 13, 2004. Much of the embezzled funds

were returned to Q-Soft in the August 3, 2004 distribution order. Even so, Q-Soft had the opportunity to file written objections and legal memoranda, seek appropriate clarifications and modifications, and participate in further hearings. The net effect was a further award to Q-Soft in the July 26, 2005 order.

■ The instant writ proceeding has provided Q-Soft an opportunity for full appellate review of all the pertinent trial court orders below. Nowhere in its petition does Q-Soft claim that any of these orders were unsupported by substantial evidence or violated its due process rights. Q-Soft never raised any due process objections, nor has it claimed that procedural shortcomings deprived it of right to full restitution. Any due process issues come too late and in too conclusory a form on a petition for rehearing. (See *Wells Fargo Bank Minnesota, N.A. v. B.C.B.U.* (2006) 143 Cal.App.4th 493, 507, fn. 9 [49 Cal.Rptr.3d 324] ["An argument may not be raised for the first time in a petition for rehearing."].)

Under these circumstances, we cannot substitute our judgment about the proper amount of full restitution for the judgment of the trial judge. Judge Kreber acts as the finder of fact, not us. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377 [14 Cal.Rptr.3d 880, 92 P.3d 369]; *People v. Stanly* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Q-Soft suggests in its petition for rehearing that its restituionary rights may be diminished because third party creditors of Wife may come forward to levy on the funds once distributed. Not so. On remand, the trial court shall determine the amount of full restitution to which Q-Soft is entitled, and distribute such funds *directly* to Q-Soft. Once full restitution has been achieved, the matter is at an end insofar as the Freeze and Seize Law is concerned, and Mahallaty and Cummings are entitled to the remaining funds held by the receiver.

### III

The parties have placed great emphasis upon the meaning of the "innocent spouse" provision in the Freeze and Seize Law. As we have noted above, this may be a straw issue, and only becomes relevant if the trial court determines, on remand, that there is a shortfall in the amount to which Q-Soft is owed as restitution.

■ As *Semaan* holds, third party claimants who assert an interest in seized assets have the burden of proof to establish that they are " 'innocent third persons, including an innocent spouse, who were not involved in the commission of any criminal activity.' " (*Semaan, supra,* 42 Cal.4th at p. 87.)

No one disagrees that Mahallaty and Cummings were "innocent spouses," in the sense they were not involved in Wife's crimes, and apparently had no knowledge of them. The court so determined in April 2004 based on uncontradicted evidence.

■ However, there are additional elements of proof for a trial court's final levy order. For innocent spouses, the trial court, in making such an order, is directed to protect only their "legitimately acquired" interests as between them and white collar crime victims. Section 186.11, subdivision (i)(3) provides: "In making its final order, the court shall seek to protect the *legitimately* acquired interests of any innocent third persons, including an innocent spouse, who were not involved in the commission of any criminal activity." (Italics added.) Under this subdivision, claimants must satisfactorily prove that the challenged assets are neither a product of the defendant's criminal activity nor otherwise actually owned by the defendant.

The People stress that this interpretation comports with the paramount public interest in reimbursing crime victims. In the People's view, innocent spouses should not receive a "windfall at the expense of the victim" where community assets were acquired with funds that were stolen from the victim "and not on the lawful activity of either husband or wife."

■ We agree. California has long held that innocent spouses cannot profit from community property acquired by fraud. In *Kemp v. Enemark* (1924) 194 Cal. 748 [230 P. 441] (*Kemp*), a wife sought to prevent foreclosure of the family home her husband had acquired through the proceeds from a fraudulent loan. The husband subsequently "decamped for parts unknown . . . ." (*Id.* at p. 751.) While acknowledging that the wife "had no notice or knowledge of any of the fraudulent representations, acts, or deeds done and made by [husband] until long after the same had been done and made," the high court declined to protect her community interest. (*Id.* at p. 752.) To do otherwise, the court concluded, would be to allow " 'she, as well as he, [to] reap the fruit of fraud.' " (*Id.* at p. 753.)

Here too, neither Mahallaty nor Cummings can preserve for himself the "fruit of fraud" of Wife at the expense of Q-Soft's right to restitution. (See *Kemp, supra,* 194 Cal. at p. 753.) At oral argument, Mahallaty conceded as much, contending instead that he did not benefit from Wife's ill-gotten gains because Wife's criminal activity took place well after their separation. In like fashion, Cummings has argued that he legitimately acquired his community share of the Dove Canyon property from his own assets.[3]

---

[3] Cummings, however, does not challenge the trial court's determination that he must pay an additional $49,573 to Q-Soft from his 50 percent share of the proceeds from the sale of the Dove Canyon property.

The People correctly assert that the burden of proof rests upon Mahallaty and Cummings as claimants to establish not only that they are innocent spouses but also that they "legitimately" acquired their community interests. The People suggest one means by which innocent spouses can protect their "legitimate" interests in community property. "[T]he court should look to the [innocent spouse] to produce substantial and credible evidence that [he or] she provided a contribution to the seized property using separate funds that are not the product of unlawful activity."

There may be other means as well by which innocent spouses can establish that they did not reap the "fruit of fraud," and we do not mean to imply that the People's proffer is the only way that innocent spouses can preserve their interests in community property.[4] The statutory language "legitimately acquired interest[]" (§ 186.11, subd. (i)(3)) is broadly worded to give trial courts a wide modicum of discretion to account for varying individual circumstances. In making these determinations, courts should balance the strong interest in fully reimbursing white collar crime victims for their losses, while protecting legitimate property interests of innocent third persons, including innocent spouses.

We stress again the contingent nature of this issue. The predicate question is whether the trial court's distribution orders of August 3, 2004 and July 26, 2005, provide full restitution to Q-Soft. If so, the trial court need not consider any further disputes regarding the legitimacy of Mahallaty's and Cummings's interests in the assets held by the receiver. The Freeze and Seize Law provides for restitution, not forfeiture.

At oral argument, the People contended that the Franchise Tax Board and Restitution Fund also are entitled to restitution as "second victims" of Wife's crimes. But, as the People itself pointed out, the Franchise Tax Board (represented by the district attorney at trial) secured a judgment for restitution on May 13, 2004, and did not file any objections to the trial court's subsequent distribution orders. For all we know, the Franchise Tax Board's judgment has been satisfied, or is in the process of being satisfied. No issues pertaining to these agencies are properly before us.

---

[4] For example, Cummings says in his unverified return (albeit without any citation to the record) that he "bought the Dove Canyon property with personal savings, paid *all* mortgage payments, utilities, maintenance, etc. for seven years." (Italics added.) To the extent that Q-Soft's rights under section 186.11 remain at issue on remand, such a claim, if proven by Cummings, could be a factor in establishing his legitimately acquired interest to portions of the frozen assets that otherwise would rightfully accrue to Q-Soft.

IV

In a footnote to its petition, Q-Soft mentions that it secured an $872,272 default judgment against Wife. Not until its reply did Q-Soft modify its prayer to specifically request that we "enter a new and different order granting release of all funds as payment toward restitution due to Petitioner, *as set forth in the civil judgment against* [*Wife*.]" (Italics added.) Q-Soft reiterated this position at oral argument, claiming that, as a third party creditor, it can pursue execution of this judgment against community assets in their entirety, regardless of fault by either Mahallaty or Cummings. (See *Lezine v. Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 63–64 [58 Cal.Rptr.2d 76, 925 P.2d 1002].)

This default judgment was taken against Wife alone, and includes a $300,000 punitive award. On July 15, 2004, Judge Steven Perk, in a separate civil action, ordered Wife to pay $572,272 in compensatory damages and $300,000 in punitive damages, for a total of $872,272. (*Q-Soft, Inc. v. Mahdavi-Cummings* (Super. Ct. Orange County, 2006, No. 01CC12016).) The default judgment recites that Wife made no appearance (she was in state prison at the time), and that it is "primarily based upon the court taking judicial notice of the prior criminal convictions for theft by said defendant, in the matter of *People of the State of California v. Azita Mahdavi-Cummings*, Orange County Superior Court, case number 99HF1125." Neither Mahallaty nor Cummings were named nor served as parties in this civil action and, in marked contrast to the instant proceedings, they did not enter an appearance or actively litigate the matter. We do not know whether Judge Perk was even apprised of Judge Kreber's restitution order of May 15, 2004, when Judge Perk entered the default judgment in July of the same year.[5]

Q-Soft makes no effort to explain whether it seeks to enforce *all* of the $872,272 default judgment against the community assets of both Mahallaty and Cummings, or *only* that portion of the judgment for compensatory damages. (Q-Soft's petition for rehearing still fails to clarify our query.) But whichever it is, we decline to do either.

Despite Q-Soft's invitation to do so, we express no opinion on the merits of unaddressed issues. (See *Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 58 [15 Cal.Rptr.3d 383] [appellate courts do not establish precedent by implication].) This specifically includes whether Mahallaty and Cummings can be held personally liable for a debt on a default judgment against the incarcerated Wife, where neither man apparently was served with

---

[5] The People erroneously assert that Judge Kreber "[a]fter trial" found that Q-Soft's loss was $872,272. The People apparently confuse Judge Kreber with Judge Perk and overlook the critical fact that the latter's order was made without any trial.

a summons and complaint in the civil action. The writ papers only indirectly mentioned the default judgment, and implicitly assumed its automatic application as to any distributions to Mahallaty and Cummings. Because the matter has not been briefed, we do not decide whether there are any due process violations in enforcing a default judgment against unserved and unnamed spouses who were actively litigating similar issues in another forum. (See, e.g., *Motores De Mexicali v. Superior Court* (1958) 51 Cal.2d 172, 176 [331 P.2d 1] ["That constitutional provision guarantees that any person against whom a claim is asserted in a judicial proceeding shall have the opportunity to be heard and to present his defenses"]; see also *Thompson v. Cook* (1942) 20 Cal.2d 564 [127 P.2d 909]; *Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 832 [26 Cal.Rptr.3d 104].)

Suffice it to say, the default judgment does not establish the amount of "full" restitution to which Q-Soft is entitled under the Freeze and Seize Law. Its enforceability—if any—against Mahallaty and Cummings should be determined in separate proceedings where any pertinent issues are directly raised and argued.

### DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to issue a new order to determine whether its distribution orders in this matter, including its further order of July 26, 2005, provide full victim restitution to Q-Soft under the Freeze and Seize Law. To the extent that the trial court determines that its previous orders provide full restitution, all remaining frozen funds shall be returned to Mahallaty or Cummings, as is appropriate. To the extent that the trial court determines there are additional portions of the frozen assets that are necessary to provide full restitution to Q-Soft, the trial court shall make such a further distribution order for Q-Soft's benefit, unless the trial court determines that Reza Mahallaty and John R. Cummings have met their burden of proof to establish that their interests in the frozen assets have been legitimately acquired and they will not reap the fruit of fraud. (See § 186.11, subd. (i)(3).) Our temporary stay shall remain in effect until this opinion becomes final.

The parties are to bear their own costs in the writ proceeding. (Cal. Rules of Court, rule 8.490(m)(2).)

Rylaarsdam, J., and Ikola, J., concurred.

A petition for a rehearing was denied December 21, 2007, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied February 13, 2008, S159756.