Filed 8/19/13 (second mod.; attached is opn. filed 7/17/13 with 8/6/13 mod. & pub. order)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | G044628 |
| v. | (Super. Ct. No. 09CF1067) |
| MICHAEL VINCENT PETRONELLA, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is ordered that the opinion filed herein on July 17, 2013, and both modified and certified for publication on August 6, 2013, be further modified as follows:

On page 20, the last full paragraph beginning with the phrase, "Defendant repeats his arguments," delete the third sentence and insert the following sentence in its place:

Defendant also argues the People's appeal should be dismissed because it lacks a valid statutory basis for taking an appeal.

There is no change in the judgment. The petition for rehearing filed August 12, 2013 is DENIED.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

THOMPSON, J.

1

Filed 7/17/13; pub. order 8/6/13; reposted 8/8/13 to include mod. filed 8/6/13 prior to pub. order (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Appellant,<br><br>    v.<br><br>MICHAEL VINCENT PETRONELLA,<br><br>  Defendant and Appellant. | G044628<br><br>(Super. Ct. No. 09CF1067)<br><br>O P I N I O N |

Appeals from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed in part and reversed in part.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Appellant.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Judith D. Sapper, Deputy Chief Counsel, Betty R. Quarles, Assistant Chief Counsel, and Anthony E. Romo, Staff Counsel, for State Compensation Insurance Fund as Amicus Curiae.

1

A jury found defendant Michael Vincent Petronella guilty of 33 counts of violating Insurance Code section 11880, subdivision (a). That statute makes it a crime for anyone to knowingly make a "false or fraudulent statement . . . of any fact material to the determination of the premium, rate, or cost of any policy of workers' compensation insurance issued or administered by the State Compensation Insurance Fund for the purpose of reducing the premium, rate, or cost of the insurance." The jury also found defendant's crimes constituted a pattern of related fraudulent felony conduct involving a loss exceeding $500,000. (Pen. Code, § 186.11, subd. (a)(2).) The superior court sentenced defendant to 10 years in state prison. It also and ordered him to pay $500,000 in restitution under Penal Code section 1202.4. Defendant appeals from the judgment raising numerous evidentiary, instructional, and sentencing issues. Both defendant and the People appeal from the trial court's restitution award. We reverse the trial court's restitution order, but otherwise affirm the judgment.

FACTS AND PROCEDURAL BACKGROUND

Defendant owned several businesses, including The Reroofing Specialists, Inc., doing business as Petronella Roofing (Petronella Roofing), Western Cleanoff, Inc. (Western), and Petronella Corporation. In September 2000, he obtained a policy of workers' compensation insurance from the State Compensation Insurance Fund (SCIF) covering Petronella Roofing and Western. Except for a one-month lapse, which resulted in a change in the policy number, SCIF automatically renewed defendant's policy every year until 2009.

SCIF is a quasi-governmental entity that provides workers' compensation insurance. It is funded from the premiums paid by insureds. Premiums are determined

2

using a formula that includes: (1) A business's gross payroll for each job classification employed by it; (2) a rating established by a regulatory agency named The Workers' Compensation Insurance Rating Bureau (WCIRB) that reflects the expected loss claims for each job classification; and (3) a rating, called an experience modification, which compares the insured's record of employee injury claims to the injury claims of the particular industry as a whole.

Defendant was required to make monthly premium payments, calculating the amount due by completing a payroll report. The report required him to identify each job classification and its gross payroll, multiply the payroll by that classification's rating, divide the product by 100, and, if an experience modification was specified, multiply the quotient by it. Defendant also had to sign each report certifying the information provided "accurately reflects the total wages, salaries, and other compensation paid to all employees . . . during the period."

SCIF annually conducted audits after each policy period ended. During the audits a SCIF agent met with defendant and, on one or two occasions, his wife. In addition to other matters, the agent verified the accuracy of the monthly payroll reports SCIF received by comparing them with copies of quarterly employee wage reports defendant claimed he had filed with the California Employment Development Department (EDD) and the Internal Revenue Service. During a January 2005 audit, defendant informed the SCIF's agent that Western had been inactive since the third quarter of 2001. Endorsements were issued removing Western from coverage under the policy.

In September 2006, an SCIF claims adjuster received a telephone call from Petronella Roofing's secretary, reporting an employee named Morales was still receiving workers' compensation benefits although he had returned to work. The adjuster asked the secretary to provide documentation. She received a copy of Morales's pay stub, reflecting he worked for Western. Noticing that Western had been reported to be

3

dormant and removed from coverage under the policy, but was still listed as an active entity on the Secretary of State's Web site, the adjuster reported the discrepancy to SCIF's special investigations unit.

The special investigations unit conducted an internal review and referred the matter to the Orange County District Attorney's Office. In April 2009, defendant was arrested and his house searched.

Investigators advised defendant of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]). He waived them and agreed to speak with the officers. Defendant said he handled "day-to-day operations," including "the payrolls." He acknowledged sending the monthly payroll reports to SCIF, and when asked if these reports were accurate, admitted they were not, claiming, "they're mostly a[n] estimated payroll." Defendant also admitted underreporting his payroll during annual audits, explaining "our [experience] modification rate was so out of whack that it . . . was prohibitive to . . . pay the premiums that were requested by SCIF." He stated the payroll reports actually filed with EDD were correct.

An SCIF claims manager compiled a list of 42 persons who filed workers' compensation claims under Petronella Roofing's policy whose payroll had not been reported to SCIF. A certified public accountant compared the payroll reports and audit documents defendant provided SCIF with the quarterly employee wage reports actually received by EDD. The accountant prepared a report reflecting the difference between the quarterly payroll defendant reported to EDD and the payroll reports he submitted to SCIF from the fourth quarter of 2000 to the fourth quarter of 2008. Over that 8-year span, the difference in payroll reported to EDD and that reported to SCIF exceeded $29 million.

The prosecution charged defendant with one count of grand theft, 36 counts of violating Insurance Code section 11880, subdivision (a), plus numerous tax evasion crimes. The information also alleged an enhancement under Penal Code section 186.11, subdivision (a). During trial, the court dismissed the grand theft charge at the

4

prosecution's request and granted defendant's motion for acquittal on the bulk of the tax evasion charges. The jury found defendant guilty of 33 counts of violating Insurance Code section 11880, subdivision (a), but acquitted him on three other similar counts and the remaining tax evasion charges. As to counts 2 through 20, the jury returned true findings the prosecution of these charges began within four years of when the crime reasonably should have been discovered. Finally, the jury also found defendant engaged in a pattern of related fraudulent felony conduct resulting in over $500,000 in losses.

DISCUSSION

*1. Insurance Code Section 11880, subdivision (a)*

Defendant attacks his convictions for violating Insurance Code section 11880, subdivision (a) on several grounds. First, he challenges the sufficiency of the evidence supporting the jury's guilty verdicts. Second, citing Labor Code section 3700.5, subdivision (a), which makes "failure to secure the payment of [workers'] compensation [insurance] . . . a misdemeanor," defendant argues his felony convictions under Insurance Code section 11880, subdivision (a) violate his constitutional right to equal protection. Third, he claims the evidence fails to support the jury's finding the prosecution filed on counts 2 through 20, within the applicable statute of limitations. Finally, in a related argument he asserts the trial court violated his constitutional rights when it denied a pretrial discovery motion for pre-2006 internal e-mails based on SCIF's assertion of the attorney-client privilege.

*a. Insufficiency of the Evidence*

Insufficiency of the evidence claims are reviewed under the "clear and well settled" substantial evidence standard of review. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) "'The proper test for determining a claim of insufficiency of evidence in a criminal

5

case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Perez* (2010) 50 Cal.4th 222, 229.) Further, "'"[c]ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'"" [Citation.]" (*People v. Abilez, supra,* 41 Cal.4th at p. 504.) Thus, "[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

As previously noted, Insurance Code section 11880, subdivision (a) makes it a felony to knowingly make a "false or fraudulent statement . . . of any fact material to the determination of the premium, rate, or cost of any policy of workers' compensation insurance issued or administered by the State Compensation Insurance Fund for the purpose of reducing the premium, rate, or cost of the insurance." The Attorney General's brief demonstrates the trial evidence established the following material facts: (1) "A comparison of the payroll reports [defendant] submitted to SCIF . . . and SCIF audit reports . . . with the . . . forms [defendant] submitted to the EDD . . . establish that for each policy year [defendant] misreported his payroll" by amounts exceeding $2 million; (2) defendant knew his businesses' "payroll was material to setting the premium" due SCIF for his workers' compensation insurance; and (3) defendant "knowingly made false statements concerning his payroll with the intent to reduce the cost of his workers' compensation insurance."

Defendant correctly asserts Insurance Code section 11880, subdivision (a) creates a specific intent crime. But he is wrong in claiming it requires the prosecution to establish the correct premium or cost of insurance to support a conviction under the statute. The statute only requires the prosecution to show defendant knowingly made a

6

false oral or written statement to SCIF material to determining the premium, rate, or cost of his insurance with the intent of reducing that figure. The prosecution presented evidence that, from 2000 to 2008, defendant knowingly and repeatedly underreported the payroll for his companies to reduce the premium he owed for workers' compensation insurance.

To a large extent, defendant's brief attempts to reargue the facts, asserting he had no intention of deceiving SCIF and blaming his convictions on what he describes as SCIF's incompetent claims administration. The fact that defendant wanted to remain competitive in the roofing industry did not justify his actions. "The best of motives provides no defense." (*People v. Thomas* (1988) 206 Cal.App.3d 689, 697; see also 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 281, p. 771.) Neither does SCIF's allegedly poor handling of defendant's policies or its purported failure to adequately audit them constitute valid defenses. A victim's contributory negligence is not a defense to a crime. (*People v. Marlin* (2004) 124 Cal.App.4th 559, 569; *People v. Schmies* (1996) 44 Cal.App.4th 38, 46.)

We conclude the evidence supports the jury's guilty verdicts.


*b. Equal Protection*

Next, defendant contends his felony convictions for violating Insurance Code section 11880, subdivision (a), violated his constitutional right to equal protection. In support of this argument he cites Labor Code section 3700.5, subdivision (a). It provides, "[t]he failure to secure the payment of compensation as required by this article by one who knew, or because of his or her knowledge or experience should be reasonably expected to have known, of the obligation to secure the payment of compensation" constitutes "a misdemeanor . . . ." Describing his actions as "knowingly partially under[]report[ing] payroll to [SCIF]," defendant argues he is similarly situated to an employer "who knowingly completely under[]reports his payroll[] by not securing

7

required workers' compensation coverage . . . ." (Italics omitted.) Thus, he claims the difference in punishment is unjustified. Not so.

Initially, the Attorney General correctly notes defendant waived the issue by failing to raise it in the trial court. (*People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503 [claim that the defendant's ineligibility for probation violated equal protection waived by not objecting on that ground in trial court].) But even on the merits his argument is unpersuasive.

To succeed on an equal protection claim a defendant must show "'"'the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner[]'"'" and "establish that there is no rational relationship to a legitimate state purpose for the state's having made a distinction between the two similarly situated groups." (*People v. Cavallaro* (2009) 178 Cal.App.4th 103, 110, fn. omitted.) Defendant cannot satisfy the claim's first requirement, two groups "'similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) The gravamen of Insurance Code section 11880, subdivision (a) is knowingly concealing a fact material to determine "premium, rate, or cost of the insurance" by one who has a workers' compensation insurance policy issued or administered by SCIF. Labor Code section 3700.5, subdivision (a) punishes one who merely should have known of his or her obligation to secure workers' compensation insurance and failed to obtain coverage. The latter statute does not involve any element of concealment or the calculation of a policy's cost. Thus, one convicted of violating the former statute is not similarly situated to one who is convicted of violating the latter statute.

*People v. Cortez* (1985) 166 Cal.App.3d 994 presents an analogous circumstance. A defendant convicted of transporting heroin argued it was "'a violation of equal protection to punish'" more seriously one whose "'possession of heroin for personal use . . . was not "stationary,"'" than "one who possesses heroin for personal use, but is not in motion when arrested . . . ." (*Id.* at p. 999.) The appellate court rejected this

8

claim, noting "'"'"The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' [Citations.]"'"' (*Id.* at pp. 999-1000.) The same is true here. Defendant's repeated fraudulent underreporting of his payroll so as to reduce the workers' compensation premium owed to SCIF is not the same as merely failing to obtain workers' compensation insurance at all.

### c. Statute of Limitations

Defendant's prosecution commenced on April 29, 2009. Counts 2 through 20 charged defendant with violating Insurance Code section 11880, subdivision (a) between September 2000 and September 2005. First, defendant claims the evidence fails to support the jury's finding that, as to counts 2 through 20, the prosecution commenced this action within the applicable statute of limitations. In the alternative, he challenges the trial court's denial of his pretrial request to review SCIF's pre-2006 internal e-mail communications, arguing this ruling violated his constitutional rights to confrontation and due process.

### (1) Timeliness

The statute of limitations for defendant's crimes was four years "after discovery of the commission of the offense . . . ." (Pen. Code, §§ 801.5, 803, subd. (c).) In applying the discovery requirement, "[L]ack of actual knowledge is not required to bring the 'discovery' provision . . . into play. The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud." (*People v. Zamora* (1976) 18 Cal.3d 538, 571-572, italics omitted.) "However, discovery of a loss by the victim *alone* is insufficient to trigger the running of the limitations period: 'Literally, . . . discovery of a loss, without discovery of a criminal agency, is not enough.' [Citation.]" (*People v. Soni* (2005) 134 Cal.App.4th 1510, 1518;

9

see also *People v. Lopez* (1997) 52 Cal.App.4th 233, 246, fn. 4.) "The question is whether there is sufficient knowledge that a crime has been committed." (*People v. Crossman* (1989) 210 Cal.App.3d 476, 481.)

The issues of when SCIF actually learned of defendant's fraud and whether, through the exercise of reasonable diligence, it could have discovered the fraud earlier, presented questions for the jury to decide. (*People v. Swinney* (1975) 46 Cal.App.3d 332, 345, disapproved on another point in *People v. Zamora, supra,* 18 Cal.3d at pp. 564-565, fn. 26.) "When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact. [Citations.]" (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369.)

Migdalia Martin, an investigator with SCIF's special investigations unit testified the insurer has "an online fraud investigation management system." If "an employee within the company finds . . . unusual activity . . . they are mandated to report that activity to the special investigations unit." Reports from persons outside SCIF are also placed into this system. She checked the department's system and found the first tip received concerning defendant's businesses was from the claims adjuster handling the Morales case in September 2006.

Again, defendant's assertions primarily amount to rearguing the facts. Martin testified discrepancies, referred to as "'red flags'" "should be" reported to her department. But she stated "a red flag doesn't mean that there is fraud." Defendant also cites to evidence indicating a dramatic increase in Petronella Roofing's experience modification and an SCIF underwriter's comment agreeing this constituted "a huge red flag." What he ignores is the underwriter's further response that he "would want to know what's going on" and "see what we can do to stop these losses." Thus, the underwriter's focus was on improving the insured's safety record, not investigating the possibility of fraud.

10

Defendant also refers to the reports prepared by several auditors going back to the policy's first annual review that indicated discrepancies in his payroll records. The testimony suggests these witnesses relied on their supervisors to determine whether discrepancies were serious enough to contact SCIF's special investigations unit. Two auditors, Alma Alexander and Gina King testified it was up to their supervisors to follow up on red flags. Alexander claimed her supervisor never questioned her about the audits. Another auditor, William Rainey, testified his supervisor was required to review audit reports submitted by him. Rainey claimed that if a supervisor found mistakes in the audit, it would have been returned to him, but he did not recall being questioned about any of the audits.

Thus, while defendant notes there was some evidence SCIF agents noticed incorrect reporting by him, he fails to establish SCIF reasonably should have suspected he was underreporting his payroll before September 2006. We conclude the evidence supports the jury's finding the prosecution timely charged defendant with the counts pre-dating October 2005.

*(2) Pretrial Discovery*

Before trial, the defense served a subpoena on SCIF that, in part, sought all internal e-mails concerning defendant's insurance policies sent between September 2000 and August 2009. SCIF gave the defense a compact disk, but it did not contain any pre-2006 e-mails. SCIF claimed that, except for two 2007 e-mails listed on its privilege log as non-core attorney work product, all of the earlier e-mails were covered by the attorney-client and attorney work product privileges. The defense sought an in camera review of the validity of SCIF's privilege claims, arguing a failure to do so would violate defendant's constitutional rights. The court allowed discovery of the two non-core attorney work product e-mails, but otherwise sustained SCIF's privilege claim without conducting an in camera review.

11

Defendant now contends the trial court's ruling violated his constitutional rights to confrontation and due process. The Attorney General disagrees. We conclude the trial court properly ruled on this issue.

As noted, SCIF asserted the attorney-client privilege to all but the two e-mails listed on its privilege log the court found subject to discovery. Confidential communications between an attorney and a client are protected by the attorney-client privilege. (Evid. Code, §§ 952, 954.) Evidence Code section 915, subdivision (a) bars "disclosure of information claimed to be privileged . . . in order to rule on the claim of privilege . . . ."

The case law also supports the trial court's ruling. In *People v. Hammon* (1997) 15 Cal.4th 1117, the Supreme Court held the trial court properly quashed a subpoena duces tecum the defendant served on psychotherapists treating the alleged victim without first conducting an in camera review of the material. "[R]eject[ing the] defendant's claim that pretrial access to such information was necessary to vindicate his federal constitutional rights to confront and cross-examine the complaining witness at trial or to receive a fair trial" (*id.* at p. 1119), *Hammon* held "the trial court was not required, at the pretrial stage of the proceedings, to review or grant discovery of privileged information in the hands of third party psychotherapy providers" (*ibid.*).

In so ruling, *Hammon* disapproved prior case law, including *People v. Reber* (1986) 177 Cal.App.3d 523, that had authorized pretrial in camera review of material claimed to be privileged and disclosure of the material if the court found a criminal defendant's confrontation right outweighed the asserted privilege. *Hammon* noted those cases relied on a United States Supreme Court decision involving a criminal defendant's trial rights (*Davis v. Alaska* (1974) 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347]), and that in a subsequent case (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [107 S.Ct. 989, 94 L.Ed.2d 40]), "no majority consensus emerged concerning the proper application of the confrontation clause of the Sixth Amendment to the pretrial discovery

12

issue . . . ." (*People v. Hammon, supra,* 15 Cal.4th at p. 1126.)  Thus, *Hammon* concluded "[w]e do not . . . see an adequate justification for taking such a long step in a direction the United States Supreme Court has not gone."  (*Id.* at p. 1127.)

The Supreme Court confronted the attorney-client privilege in *People v. Gurule* (2002) 28 Cal.4th 557.  Garrison, the defendant's accomplice, entered into a plea deal that required him to testify for the prosecution.  Due to concerns about Garrison's mental stability the court ordered him examined by several psychiatrists.  Before trial, the defendant sought discovery of the psychiatrists' records.  Garrison's attorney objected.  Noting that he had retained two of the psychiatrists before the court ordered them to examine Garrison, counsel claimed the reports were confidential under both the psychotherapist-patient and attorney-client privileges.  The trial court concluded some of the court-ordered examinations were discoverable, conducted an in camera review of these materials, and ordered the records disclosed to the defense.  As to all of the other records, the trial court found them covered by the attorney-client privilege and thus not subject to review.

Rejecting the defendant's claim, "denying him full access to Garrison's psychiatric records" violated his federal constitutional rights, the Supreme Court affirmed.  (*People v. Gurule, supra,* 28 Cal.4th at p. 591.)  First, "[u]nder *Hammon* . . . psychiatric material is generally undiscoverable prior to trial.  Defendant, then, received more discovery than he was legally entitled to . . . ."  (*Id.* at p. 592.)  Second, as for the materials found to be covered by the attorney-client privilege, *Gurule* held the trial court properly declined to conduct an in camera review to determine their materiality.  (*Id.* at p. 593.)  "'The attorney-client privilege is one of the oldest recognized privileges for confidential communications' [citation] and is 'one which our judicial system has carefully safeguarded with only a few specific exceptions' [citation].  We have held that a criminal defendant's right to due process does not entitle him to invade the attorney-client privilege of another.  [Citation.]  To the extent defendant claims his

13

right to confrontation or due process entitles him to gain access to the confidential communications between Garrison, his attorney, and his defense experts, he is thus mistaken." (*Id.* at p. 594.)

The same result applies in this case. Defendant seeks to distinguish the foregoing cases by arguing he was seeking information relevant to the statute of limitations issue, not to impeach the prosecution's witnesses. But neither *Hammon* nor *Gurule* limited its holding to pretrial discovery concerning witness impeachment.

Defendant cites *People v. Mincey* (1992) 2 Cal.4th 408 and *Vela v. Superior Court* (1989) 208 Cal.App.3d 141 in support of his argument. *Mincey* involved the trial court's restriction of defense counsel's questioning of a witness concerning her state of mind that occurred *during* trial, not pretrial discovery of what her attorney told her. (*People v. Mincey, supra,* 2 Cal.4th at pp. 462-463.) *Vela* held a city could not use the attorney-client privilege to bar criminal defendants from seeking pretrial discovery of "statements made by its police officers to an investigating team organized by the city's police department to gather and preserve evidence for use by the city attorney in the defense of a possible future *civil action.*" (*Vela v. Superior Court, supra,* 208 Cal.App.3d at p. 144.) But *Vela* was decided before the Supreme Court's decision in *Hammon* and relied on both *Davis v. Alaska, supra,* 415 U.S. 308 and *People v. Reber, supra,* 177 Cal.App.3d 523 to reach its conclusion. As noted, both the United States and California Supreme Courts have recognized *Davis* is inapplicable to pretrial discovery claims and *Reber* is no longer the law. Thus, defendant was not entitled to have the court conduct an in camera review of SCIF's e-mails claimed to be covered by the attorney-client privilege or to obtain disclosure of them.

Furthermore, defendant was allowed to fully question SCIF employees about the scope of their audits of his business. In addition, he questioned SCIF's investigator about when the investigations unit received reports about defendant's possible fraudulent activity. As mentioned, she testified the first report appeared in the

14

September 2006 e-mail from the claims adjuster handling the Morales file. Thus, we conclude the trial court did not err in denying defendant's pretrial request to review SCIF's e-mails covered by the attorney-client and attorney work product privileges.

*2. Penal Code section 186.11*

Penal Code section 186.11, "known as the aggravated white collar crime enhancement" (Pen. Code, § 186.11, subd. (a)(1)), imposes increased punishment on "[a]ny person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct" (*ibid.*), including where "the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000) . . . . (Pen. Code, § 186.11, subd. (a)(2)). At the close of the prosecution's case, the defense made a motion for acquittal under Penal Code section 1118.1 on this enhancement allegation. The court denied the motion and the jury returned a true finding on it.

Defendant now challenges the sufficiency of the evidence supporting the finding on two grounds. First, he argues "there was no competent calculation of [the] proper premium payable, and that calculation was beyond the jurors' capabilities." Second, defendant claims since he "was convicted of 33 counts of violating Insurance Code section 11880[, subdivision (a)]," he "was not convicted of two or more 'related felonies,' within the meaning of . . . Penal Code section 186.11 . . . ." Both contentions lack merit.

"The standard applied by the trial court under [Penal Code] section 1118.1 in ruling on a motion for judgment of acquittal is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.) "Review of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on

15

the state of the evidence as it stood at that point. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215; see also *People v. Roldan* (2011) 197 Cal.App.4th 920, 924.)

The prosecution's evidence included testimony concerning the process used by an insured to calculate its premium on a payroll report as well as copies of defendant's payroll reports. In addition, the People introduced copies of the quarterly wage and withholding reports defendant submitted to the EDD. As the trial court concluded "it may take [some] work [by] the jurors, but there is evidence [of] the amount of loss . . . of premiums" and consequently "there [are] facts to support a true finding." We agree with this conclusion.

As for defendant's second argument, he claims "'related felonies' can only be different felonies; they cannot be the same [felony]." This argument ignores the definitions of the phrases "a pattern of related felony conduct" and "two or more related felonies" appearing in Penal Code section 186.11, subdivision (a)(1). The first phrase "means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (*Ibid.*) The latter phrase is defined as "felonies committed against two or more separate victims, or against the same victim on two or more separate occasions." (*Ibid.*; see also *People v. Mozes* (2011) 192 Cal.App.4th 1124, 1129 [applying statute where the defendant pleaded guilty to 17 counts of theft by false pretenses].) Under these definitions, defendant's multiple convictions for violating Insurance Code section 11880, subdivision (a) satisfied the enhancement's statutory requirements.

Thus, we reject defendant's attack on the jury's true finding under Penal Code section 186.11, subdivision (a)(2).

16

*3. Mistake of Fact*

Next, defendant claims the trial court had a duty to instruct the jury sua sponte on mistake of fact as a defense and its failure to do so prejudiced him.  He argues his statements to the investigators indicated "[h]e believed he was paying proper premiums, avoiding inflated out of 'whack' premiums."  Consequently, defendant argues he "lacked factual knowledge of what the proper premiums should have been" and "therefore, he lacked the intent to reduce them."  This argument lacks merit.

Penal Code section 26 declares, "All persons are capable of committing crimes except those belonging to the following classes:  [¶] . . . [¶] Three -- Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."  As the Attorney General argues, the case law defeats his reliance on a trial court's duty to instruct sua sponte on mistake as a defense.

In *People v. Anderson* (2011) 51 Cal.4th 989, the Supreme Court affirmed a felony murder conviction with a true finding the killing occurred during the course of a robbery, rejecting a claim the trial court erred by failing to instruct on accident as a defense where, in the process of stealing the victim's car, the defendant ran over her. "That the law recognizes a defense of accident does not, however, establish that trial courts have a duty to instruct on accident sua sponte.  'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.]  That duty extends to '"instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"  [Citation.]"  But ""when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties.  While a court may well have a duty to give a 'pinpoint' instruction relating such

17

evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request."'"" (*Id.* at pp. 996-997.)

*People v. Lawson* (2013) 215 Cal.App.4th 108 recently applied *Anderson's* holding to a claim the trial court erred in failing to, sua sponte, instruct on mistake of fact. First, *Lawson* noted "[t]he mistake-of-fact defense operates to negate the requisite criminal intent or mens rea element of the crime, . . . specifically when the defendant holds a mistaken belief in a fact or set of circumstances which, if existent or true, would render the defendant's otherwise criminal conduct lawful. [Citations.]" (*Id.* at p. 111.) The court then held "[l]ike the defense of accident, an instruction on the defense of mistake of fact would have served only to negate the mental state element of the crime. Thus, at least as asserted here, the defense of mistake of fact was not a true affirmative defense." (*Id.* at p. p. 118.)

As in the foregoing cases, defendant did not request a "pinpoint" instruction on whether he mistakenly believed he was paying the proper premiums. Furthermore, it is doubtful such an instruction would result in a different verdict. Defendant acknowledged the information he provided to SCIF on the payroll reports and during the annual audits was not accurate and that he was aware of the inaccuracies. Assuming defendant was correct in complaining about SCIF's handling of workers' compensation claims and in calculating his company's experience modification rate, it would not authorize his falsely representing the size of payroll simply to "clean it up by balancing out some of the employees into another company . . . ." Consequently, even if a mistake of fact theory was consistent with the defense theory of the case, the evidence failed to support giving an instruction on it.

18

*4.  Penal Code section 654*

The prosecution charged defendant with violating Insurance Code section 11880, subdivision (a) based on the false payroll reports he submitted to SCIF for each quarter that he filed an accurate employee wage report with EDD.  In sentencing defendant on the 33 counts where the jury returned guilty verdicts, the trial court selected count 2 as the principal term, imposed the three-year midterm plus a consecutive three-year term for the white collar crime enhancement under Penal Code section 186.11, subdivision (a)(2), and consecutive one-year terms on counts 7, 12, 16, and 20.  On the remaining counts, the trial court imposed concurrent three-year terms.

Arguing he "was not charged with making false statements to EDD," but "with making false statements to SCIF," which "audited him on an annual basis," defendant argues "[t]he record . . . reflects, at most, five separate courses of conduct" and the concurrent counts on the remaining charges violated Penal Code section 654.  Again, we find his argument unpersuasive.

Penal Code section 654, subdivision (a) declares, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  This statute "limit[s] punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time, in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. omitted.)  But "'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.'  [Citation.]  'This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the

19

violation of public security or policy already undertaken.'" (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289 [applying exception to arson and insurance fraud].)

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence. [Citation.] 'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.) Here, the evidence supports a conclusion defendant provided false monthly payroll reports and forged EDD documents to SCIF agents during annual policy reviews over an extended period of time and, before submitting these documents, had the opportunity to reflect on his conduct. Thus, the record supports a conclusion the trial court's sentence did not violate the prohibition on multiple punishment.

5. *The Restitution Award*

a. *Introduction*

As noted, the trial court awarded SCIF victim restitution of $500,000. Both parties challenge the correctness of this ruling. They agree the amount of the restitution order was arbitrary and it should be reversed, but disagree as to the reasons why and what should happen upon remand.

Defendant repeats his arguments that (1) the evidence fails to support the jury's finding on the Penal Code section 186.11 enhancement, and (2) the losses incurred resulted from SCIF's allegedly incompetent claims handling. Thus, he contends the prosecution "failed to sustain [its] burden of proof" and seeks a reversal of the restitution award "on the ground[] of insufficient evidence." In his reply brief defendant for the first time argues the People's appeal should be dismissed because it lacked a valid statutory basis for taking an appeal. Citing the court's "refusal to find SCIF's statements of loss

20

sufficient to establish a prima facie case and its insistence that the People perform essentially a forensic audit of [defendant's] records . . . in order to substantiate [its] loss," the Attorney General complains the trial court "improperly placed a higher burden on the People than required" by the victim restitution statute.

We conclude the People can appeal from the restitution order and, based on the appellate record, the trial court abused its discretion by relying on irrelevant factors and without considering all of the evidence presented to it to order $500,000 in restitution to SCIF.

### b. Background

At the sentencing and restitution hearing, the trial court received briefs and documents, including declarations and letters presented by the parties and SCIF, plus defendant's testimony.

The prosecution's evidence included a letter from a SCIF senior vice-president providing a general review of workers' compensation insurance. It also introduced premium statements based on a final audit of defendant's business. (Display Bills.)

In addition, the prosecution introduced two letters from Randy Hogan, an underwriting manager with SCIF, summarizing the financial impact of defendant's fraud. Hogan's letters contained two separate calculations of defendant's underpayment of premiums. First, "[b]ased on the payroll figures reported to the State of California (i.e., EDD quarterly employee wage reports) and the job duties provided by [defendant's] office managers," Hogan concluded "the total premium owed for the coverage provided by [SCIF]" for the 2000 to 2008 policies was a little over $37 million. During this period defendant paid approximately $1.75 million in premiums, leaving a difference between the amount paid and what should have been paid of over $35.2 million. Hogan's second calculation, described as a "hypothetical 'best case' model," was based on an assumption

21

defendant "had reported the actual payroll and such would have [been] available to the WCIRB for use in the calculation of the [experience modifications]." Under this approach Hogan concluded "the total premium owed for the coverage provided by [SCIF] would have been" about $13.4 million which, after deducting the premiums defendant paid, left "an amount due of" approximately $11.6 million. The court accepted the prosecution's additional request to consider the trial exhibits, particularly the EDD quarterly wage and withholding reports for Petronella Roofing and Western, for the purpose of determining restitution.

The prosecution also argued the court should apply an approach based on the Uniform Statistical Rating Plan (USRP) in determining the amount of unpaid premiums. The USRP provides that if an employer fails to maintain accurate records of its employee payroll, an insurer may use the highest possible rating for each job classification in calculating the premium owed.

The defense introduced two declarations from Dr. Arthur J. Levine, an attorney and author, concerning workers' compensation insurance premium issues. In his first declaration, Levine stated he had reviewed numerous documents and concluded, "[h]ad the proper payroll and classifications been reported" by defendant the WCIRB's experience modification ratios would have resulted in a drastic reduction in the actual premium owed. He claimed a calculation using the "amended experience modifications alone would reduce the amount of SCIF's premium over the period 2000-2008 by two-thirds." However, since "rating regulations do not permit the WCIRB to use estimated payrolls for experience modification calculations," it was necessary for "SCIF [to] conduct a physical payroll audit of [defendant's] records for each applicable year" and, "[u]ntil then, . . . the amount that [defendant] owes to SCIF cannot be accurately determined." Levine's second declaration repeated much of what appeared in the first. But he supplemented it with opinions derived from an interview with defendant. Levine "conclude[d] that there are many other material (or potentially material) facts that, if

22

determined to be true, would very substantially further reduce the total amount of [the] premium[s]."

Defendant testified SCIF insisted all of his employees be classified as roofers regardless of the nature of their work simply because he operated a roofing business. Thus, defendant claimed he segregated his employees, placing the roofers under Petronella Roofing covered under SCIF's policies, and the remaining employees under Western which he self-insured. In 2001, defendant added Western to SCIF's policy after it agreed to allowed him to use two additional employee classifications. But four months later SCIF eliminated the new classifications. Defendant claimed he then terminated SCIF's coverage of Western and again personally assumed the risk, insisting he "paid every claim." According to defendant, he later contracted with an employment leasing business to cover Western's employees.

Defendant asserted SCIF failed to adequately instruct him on its policy requirements. He further claimed the SCIF policies contained erroneous experience modification ratings. In part, this resulted from SCIF either "overreserv[ing]" claims or "le[aving] [them] open too long." No one with SCIF ever discussed the matter with him. He insisted SCIF's remedy for improper payroll reporting was rescission, not criminal prosecution. Defendant also believed SCIF's right to recover for lost premiums between 2000 and 2004 was barred by the statute of limitations. He asserted Morales's claim was a mistake caused by SCIF's failure to "ask the right questions." Finally, defendant introduced a chart of his own calculations on the amount of premiums he owed under the second policy covering 2004 to 2009, claiming SCIF "profited" from what he paid it.

In ruling on the victim restitution issue, the court agreed "the loss of premiums is a proper basis for restitution." But it rejected Hogan's calculations, describing them as "not credible." "[W]ith respect to the first calculation, . . . it's the highest [experience modification factor]. If the court were to impose that, there would

23

be . . . in the court's opinion . . . error because . . . restitution cannot be punitive" and "in excess of what the actual loss is." The court rejected Hogan's second calculation, noting it was based on hypothetical experience modifications. "The calculation has to be based on what the actual loss was, and . . . it doesn't have to be exact, but it can't be based on speculation. . . . [T]here . . . isn't any basis . . . as to how [Hogan] came up with the calculations."

The court concluded, "From the record that I have before me, I cannot conclude what was owed, except for the jury finding [on the enhancement that the loss exceeded $500,000.]" It gave the following reasons for this decision: "One, the calculation problems and the credibility rejection of . . . Hogan's . . . opinions"; "[T]wo, the . . . fact that sometime in 2006, . . . the [policy]. . . should have [been cancelled]. . . . [¶] Number three, . . . I do feel that SCIF also can pursue this issue of restitution in a civil court . . . . Four, . . . when we get to sentencing, the court is going to be imposing a substantial fine . . . . [¶] But finally, as I indicated, it's time to move on. . . ."

### c. Analysis

#### (1) People's Right to Appeal

The first issue is defendant's claim the People's appeal must be dismissed because the appeal is not authorized by statute. Generally, we ignore arguments raised for the first time in a party's reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) But since, as defendant notes "[t]he People have no right of appeal except as provided by statute" (*People v. Douglas* (1999) 20 Cal.4th 85, 89), which raises a jurisdictional issue, we shall consider his claim.

The rulings from which the People may appeal are contained in Penal Code section 1238. The Attorney General cites Penal Code section 1238, subdivision (a)(5),

24

allowing an appeal from "[a]n order made after judgment, affecting the substantial rights of the people," as the basis for the appeal in this case.

We conclude the People may maintain this appeal. In *People v. Hamilton* (2003) 114 Cal.App.4th 932, the prosecution appealed from an order at a probation revocation hearing where the trial court ruled insurance payments a victim received from insurers could be used to offset the defendant's victim restitution obligation. The Court of Appeal held the People could appeal under Penal Code section 1238, subdivision (a)(5). (*People v. Hamilton, supra,* 114 Cal.App.4th at p. 938.)

In *Hamilton*, the order modifying defendant's victim restitution was entered *after* the defendant had been sentenced. Here, the restitution order was made during a combined hearing on sentencing and restitution. However, in *People v. Akins* (2005) 128 Cal.App.4th 1376, the court followed *Hamilton* and allowed the People to appeal a restitution order even though it was entered at the sentencing hearing. (*Id.* at p. 1381, fn. 3.)

While "the primary purpose of mandatory restitution . . . is reimbursement for the economic loss and disruption caused to a crime victim by the defendant's criminal conduct" (*People v. Runyan* (2012) 54 Cal.4th 849, 865), "the requirement that a convicted criminal defendant pay restitution for the losses caused by his crime has aims beyond strict compensation that include deterrence and rehabilitation" (*ibid.*). Consequently, "[r]estitution hearings held pursuant to [Penal Code] section 1202.4 are sentencing hearings and are thus hearings which are a significant part of a criminal prosecution." (*People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386.) In *Dehle*, the court reversed a restitution order where the victim's private counsel conducted the restitution hearing without a prosecutor being present. Noting that, "'[i]n California, all criminal prosecutions are conducted in the name of the People of the State of California and by their authority'" (*id.* at p. 1386), and that "'[t]he district attorney of each county is the public prosecutor, vested with the power to conduct on behalf of the People all

25

prosecutions for public offenses'" (*id.* at p. 1387), *Dehle* held "[t]he trial court abused its discretion when it allowed the restitution hearing to go forward without the presence of the people" (*id.* at p. 1390).

Given the importance of the prosecution's presence at victim restitution hearings conducted under Penal Code section 1202.4 and the state's interest in ensuring the constitutional right to victim restitution be properly enforced (Cal. Const., art. I, § 28, subd. (b)(13)), we conclude the People have a right to appeal the trial court's restitution order in this case.

### *(2) The Restitution Order*

Penal Code section 1202.4, subdivision (f) declares "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states them on the record." In addition, "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution order, nor shall inability to pay be a consideration in determining the amount of a restitution order." (Pen. Code, § 1202.4, subd. (g).)

No California case appears to have held the willful underpayment of insurance premiums constitutes an economic loss under Penal Code section 1202.4. But since "the statute uses the language 'including, but not limited to' the[] enumerated losses, a trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1046.) In *United States v. Simpson* (6th Cir. 2008) 538 F.3d 459, the court held "unpaid [workers'

26

compensation] premiums fall squarely within the definition of 'loss'" under federal sentencing guidelines. (*Id.* at p. 462.) Further, defendant does not challenge the trial court's conclusion SCIF's loss of premiums is a recoverable economic loss in this case.

The People had the burden of proving, by a preponderance of the evidence, the amount of SCIF's economic loss. (*People v. Giordano* (2007) 42 Cal.4th 644, 664; *People v. Baker* (2005) 126 Cal.App.4th 463, 469.) On appeal, "we review the trial court's restitution order for abuse of discretion. [Citations.] The abuse of discretion standard is 'deferential,' but it 'is not empty.' [Citation.] '[I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.] Under this standard, while a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the . . . victim's economic loss. To facilitate appellate review of the trial court's restitution order, the trial court must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*People v. Giordano, supra,* 42 Cal.4th at pp. 663-664.) "The order must be affirmed if there is a factual and rational basis for the amount. [Citation.]" (*People v. Akins, supra,* 128 Cal.App.4th at p. 1382.)

As for defendant's insufficiency of the evidence claim, we have previously rejected it. During the sentencing and restitution hearing, even the trial judge acknowledged he "massively underreported his payroll." Thus, we find defendant's ground for reversing the restitution order lacks merit.

However, a review of the trial court's reasons for awarding SCIF $500,000 in restitution clearly indicates it abused its discretion in reaching this decision. At trial, a certified public accountant, called by the prosecution, testified his comparison of the false documents defendant presented to SCIF's agents during audits and the accurate quarterly EDD reports indicated defendant underreported his payroll by over $29 million. The jury

27

returned a finding, based on proof beyond a reasonable doubt, that defendant "engaged in a pattern of related fraudulent . . . conduct involving the loss of *more than* $500,000 during the commission of the offenses" upon which he was found guilty. (Italics added.) The court's conclusion, based on the preponderance of the evidence standard, that the total sum of restitution owed SCIF for defendant's underpayment of premiums was only $500,000 strongly suggests it reached an arbitrary result.

Further, none of the reasons cited by the court support the award. The court's belief "it's time to move on," is not relevant to a determination of the amount of restitution to be awarded. Penal Code "[s]ection 1202.4, subdivision (f) provides that, 'If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court.' Under a reading of the plain language of section 1202.4, if the court cannot determine the amount of restitution at the time of sentencing, there is no limitation upon when the court must next set a restitution hearing . . . ." (*People v. Bufford* (2007) 146 Cal.App.4th 966, 971.) The court could have imposed sentence on defendant and continued the restitution hearing if it felt additional evidence was needed to determine the amount of SCIF's economic loss.

The third and fourth reasons expressed are also contrary to the applicable law as well as irrelevant in determining the amount of restitution. As for SCIF's right to seek recovery in a civil action, "[w]hether the victim also holds a contractual remedy against the defendant is irrelevant for the purposes of determining the defendant's restitution obligation." (*People v. Busser* (2010) 186 Cal.App.4th 1503, 1511; see also *Q-Soft, Inc. v. Superior Court* (2007) 157 Cal.App.4th 441, 447 ["crime victim's theoretical right to pursue civil remedy against wrongdoer should not be allowed to substitute for . . . 'constitutional "right to restitution"'"].) Nor was the imposition of a substantial fine pertinent to the award of victim restitution. Penal Code section 1202.4, subdivision (a)(3) distinguishes between restitution fines and victim restitution. "The

28

enactment of discrete subdivisions for the payment of a fine . . . and the payment of restitution directly to the victim . . . readily manifests a legislative intent to segregate and distinguish a 'penalty assessment' from 'victim restitution.'" (*People v. Boudames* (2006) 146 Cal.App.4th 45, 51 [agreeing "victim restitution is different from and does not encompass any statutory monetary penalties to which a defendant may be subject"].)

Next, the court apparently concluded SCIF contributed to the amount of its loss of premiums by failing to cancel defendant's policy in 2006 when it first discovered the possibility defendant was intentionally underreporting his payroll. In *People v. Brunette* (2011) 194 Cal.App.4th 268 (*Brunette*), the trial court awarded victim restitution to an agency that arranged care for the defendant's dogs after he was convicted of animal cruelty and neglect even though the agency had previously failed to respond to reports the defendant was failing to provide proper animal care. The appellate court rejected the defendant's request the award be apportioned on the basis of comparative fault principles, in part finding, the "[d]efendant's lack of care for his dogs . . . in wanton disregard for their lives . . . is close enough to the criminal equivalent of an intentional tort to bar invoking comparative fault principles." (*Id.* at p. 283.)

In so ruling, *Brunette* distinguished *People v. Millard* (2009) 175 Cal.App.4th 7, which held comparative fault applied to a victim restitution award in a felony drunk driving case because that offense required only proof of criminal negligence. (*Id.* at p. 41.) But civil cases have recognized comparative fault principles do not apply in cases involving intentional torts. (*Thomas v. Duggins Construction Co.* (2006) 139 Cal.App.4th 1105, 1112-1113; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 349.) And even *Millard* acknowledged "'a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim . . . . [Citations.]'" (*People v. Millard, supra,* 175 Cal.App.4th at p. 38.) This case involves convictions for intentional fraud. Thus,

29

whether SCIF should have acted sooner to reduce its losses is not a relevant factor in determining its right to or the amount of restitution.

The last ground cited for the trial court's ruling was the purported lack of credibility of Hogan's calculations. As for the second calculation, utilizing a "hypothetical 'best case' model," we agree the trial court was well within its discretion in finding it speculative. "[T]he trier of fact is not required to believe the testimony of any witness, even if uncontradicted." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1487.)

But the court rejected Hogan's first calculation for a different reason. The court cited only the fact Hogan employed the highest experience modification rating in calculating the unpaid premium, thereby raising the specter defendant "would be basically given a penalty assessment and . . . the loss of premiums would be in excess of what the actual loss is." While administrative regulations may have required Hogan to apply that factor in calculating defendant's premiums, we recognize the court could deviate from the regulatory requirements in determining the amount of victim restitution. (*People v. Akins, supra,* 128 Cal.App.4th at p. 1387 [court exercising discretion to determine the amount of restitution "may do so according to any rational method that could reasonably be said to make the victim whole" and is not circumscribed by "state and federal regulations that require [an agency] to calculate the amount of overpayment according to a different method"]; see also *People v. Hudson* (2003) 113 Cal.App.4th 924, 927-929.) But the court did not otherwise criticize Hogan's calculation method or the information he relied on to calculate SCIF's loss. Further, the court had other evidence it could have considered to ameliorate the possibility Hogan's calculation would result in a penalty.

Levine's second declaration stated "that had [defendant] reported to SCIF, and SCIF then passed on to the WICRB all of the payroll that SCIF ultimately used in its 'Display Bills,' the 'experience modifications' applicable to [defendant's] insurance

would have been dramatically lower" and "would have resulted in workers[']
compensation insurance premiums of only about one-third the amount shown on the
Display Bills."  The Display Bills prepared as part of the final audit determined
defendant's total premium was approximately $34.2 million.  Had the trial court applied
Levine's approach concerning the experience modification factor, it could have reduced
the $34.2 million sum by two-thirds to $11.14 million.  Subtracting defendant's $1.75
million premium payments would result in a substantially lower, but nonetheless
significant loss to SCIF of approximately $9.65 million.

In issuing its restitution order the court declared "what was not done is to
take what we know was the truth, go back [to] whatever period of time there was, and for
somebody to fill in and find out who those workers were, assign . . . whatever
modification factor it was, and determine what the premium is."  But Penal Code
"'"[s]ection 1202.4 does not, by its terms, require any particular kind of
proof. . . ."'  "'This is so because a hearing to establish the amount of restitution does not
require the formalities of other phases of a criminal prosecution.'"'" (*People v.
Lockwood* (2013) 214 Cal.App.4th 91, 96.)

Further, that is what Hogan attempted to do when performing his first
calculation.  His March 2010 letter gave the following explanation of the method used to
perform the first calculation:  "[T]he assignment of an employee's payroll to the correct
classification depends on the duties of the employee.  For payroll that was reported to
[SCIF] and presented at the time of audit, the assignment is not in question.  However,
for the amounts not reported to [SCIF], those appearing only on EDD reports, the duties
of the employees needed to be ascertained.  While the Commissioner's regulations
require an insurer to assign all unidentified payroll into the highest-rated applicable
classification, in this case roofing, we have relied on interviews . . . of [defendant's]
office managers.  Although [SCIF] is unable to verify the employees' job duties
provided, we are accepting the managers' statements as valid.  Those employees

31

identified as engaging solely in carpentry, painting, sheet metal, or office work have been reassigned to the proper classifications. To avoid the chance of all but the most unreasonable objections, every 'benefit of the doubt' was given when making these assignments."

In addition, a more accurate calculation of the actual premiums owed by defendant was likely impossible. During the sentencing and restitution hearing, defendant testified he frequently was performing 40 to 50 jobs at a time, the work frequently involved construction work other than merely constructing or repairing roofs, and that he "interchange[d] . . . employees" between his companies on projects, "essentially . . . go[ing] from one trade to another trade . . . ." If true, it would be extremely difficult to go back through eight years of records and classify the work being performed by each employee during each reporting period.

"The trial court is not required to order restitution equal to the exact amount of the loss, but it must employ a rational method that makes the victim reasonably whole." (*People v. Garcia* (2011) 194 Cal.App.4th 612, 617.) In *People v. Hudson, supra,* 113 Cal.App.4th 924, the trial court refused to award any restitution to a welfare agency after it refused to recalculate the amount of reimbursement the defendant owed for being overpaid food stamps under a state regulation generally allowing the department to disregard a percentage of an applicant's income in determining his or her entitlement to this benefit. The Court of Appeal reversed. While agreeing the agency's "belief in the rectitude of [its] position . . . d[id] not entitle [it] to ignore" the trial court's order (*Hudson* at p. 929), the appellate court held the trial "court's decision bestowed a windfall upon the miscreant and failed to comply with the court's statutory obligation under [Penal Code] section 1202.4, subdivision (f)." (*Ibid.,* fn. omitted.)

Here, the trial court did award restitution to SCIF. But, by failing to consider all of the evidence presented to it concerning restitution and relying on irrelevant factors to pick a figure out of thin air that was less than what the jury found to

32

have been SCIF's loss, the court clearly abused its discretion by not "employ[ing] a method that is rationally designed to determine the . . . victim's economic loss."  (*People v. Giordano, supra,* 42 Cal.4th at pp. 663-664.)  Therefore, the victim restitution order must be reversed and the matter remanded for a new hearing.

## DISPOSITION

Appellant Michael Vincent Petronella's convictions for violating Insurance Code section 11880, subdivision (a), the jury's true finding on the white collar crime enhancement (Pen. Code, § 186.11, subd. (a)(2), and the sentence imposed by the superior court are affirmed.  The victim restitution award is reversed and the matter remanded to the superior court for further proceedings.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

THOMPSON, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>MICHAEL VINCENT PETRONELLA,<br><br>    Defendant and Appellant. | G044628<br><br>(Super. Ct. No. 09CF1067)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING; NO CHANGE IN<br>JUDGMENT |

It is ordered that the opinion filed herein on July 17, 2013, be modified as follows:

On page 24, in the second full paragraph, beginning "The first issue is," delete the second and third sentences and accompanying case citations.

There is no change in the judgment. The petition for rehearing is DENIED.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

THOMPSON, J.

34

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|   Plaintiff and Appellant, | G044628 |
| v. | (Super. Ct. No. 09CF1067) |
| MICHAEL VINCENT PETRONELLA, | O R D E R |
|   Defendant and Appellant. | |

The Office of the District Attorney for Orange County has requested our opinion in the above entitled case, filed on July 17, 2013, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


THOMPSON, J.