Filed 1/15/16

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMUEL BUTLER,<br><br>    Defendant and Appellant. | B259153<br><br>(Los Angeles County<br>Super. Ct. No. NA098874) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James B. Pierce, Judge. Affirmed as modified with directions.

Hart J. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Mary Sanchez and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

---

*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I, II, III(F) and IV this opinion are certified for publication.

## I. INTRODUCTION

A jury convicted defendant, Samuel Butler, of misdemeanor false imprisonment (Pen. Code, § 236)[1] and felony resisting an executive officer (§ 69). Defendant was sentenced to concurrent terms totaling two years in the county jail. Prior to the amendments resulting from the Criminal Justice Realignment Act of 2011, section 1202.45 required imposition and stay of a parole revocation restitution fine on defendants sentenced to prison. As we shall explain, section 1202.45 has since been amended to provide for parole, post-release community supervision or mandatory supervision revocation restitution fines. (§ 1202.45, subds. (a)-(b).) The trial court imposed what is characterized in the record as a section 1202.45 revocation fine. In the published portion of the opinion, we conclude no type of section 1202.45, subdivisions (a) and (b) revocation restitution fine could have been imposed. We modify the judgment and affirm it as modified.

## II. THE EVIDENCE

On April 13, 2014, defendant was arrested following a fight with his wife, Milagros Vasquez. Ms. Vasquez, a reluctant witness, testified as follows. Defendant was not living with Ms. Vasquez at that time of the fight. But defendant came to Ms. Vasquez's apartment that evening at her request. Ms. Vasquez's three children—ages four, six and nine—were present. Defendant is the biological father of the younger two children.

Defendant and Ms. Vasquez had an argument in the hallway. Ms. Vasquez was angry and yelling. She went into the bedroom and began throwing defendant's belongings around. Defendant told her, "Don't go crazy." They began hugging and

---

[1] Further statutory references are to the Penal Code except where otherwise noted.

kissing, but then Ms. Vasquez slapped defendant in the face. Defendant restrained her hands so she could not slap him again. Defendant was lying on top of Ms. Vasquez on the bed holding her hands so she could not hit him when two police officers arrived.

Ms. Vasquez telephoned an emergency operator. Ms. Vasquez said there was no emergency, but requested that the police be sent to her apartment. Ms. Vasquez said defendant had arrived at her apartment in violation of a restraining order. In the telephone call, Ms. Vasquez also said, "[H]e has my son." At one point, the emergency operator asked: "[Y]ou said he has your son. What does that mean?" Ms. Vasquez responded, "Yeah. Yeah." and then said her son's name. At trial, Ms. Vasquez at first denied it was her voice on the recording. Upon further questioning, Ms. Vasquez admitted calling the emergency operator.

Francesca Gonzales lived across the hall from Ms. Vasquez. Ms. Gonzales sometimes babysat Ms. Vasquez's children. On the evening defendant was arrested, Ms. Vasquez's oldest child, "Coco," knocked on Ms. Gonzales's door. Coco asked Ms. Gonzales to help Ms. Vasquez. Ms. Gonzales went into Ms. Vasquez's bedroom. She saw defendant on top of Ms. Vasquez. Defendant was holding Ms. Vasquez down by her waist. Defendant had his arms around Ms. Vasquez's waist. Defendant was saying: "I want to talk to you. Calm down." Ms. Vasquez was trying to get away. She was yelling at defendant to get off her and to let her go. Ms. Vasquez appeared to be angry. As Ms. Gonzales left to call an emergency operator, police officers arrived.

Officer Steve Tallakson and a partner, Officer Deantraye Dantzler, arrived in response to Ms. Vasquez's telephone call. As the officers approached the apartment, Officer Tallakson could hear Ms. Vasquez screaming, "Let me go." Ms. Gonzales told Officer Tallakson: "He's in there. He won't let her go." Coco told Officer Tallakson: "He's hurting my Mommy. He won't let her go."

Officer Tallakson entered the bedroom. Officer Tallakson saw defendant holding Ms. Vasquez, who was on her back, down on the bed. Defendant was lying on his side looking directly at Ms. Vasquez. Officer Tallakson described how hard defendant was squeezing Ms. Vasquez: "He was squeezing her. You could see the veins popping out of

3

his arms. [¶] . . . The muscles were tense. Veins were popping out of the neck. . . ." Defendant had his arms and legs wrapped around Ms. Vasquez in a manner that prevented her from moving. According to Officer Tallakson, Ms. Vasquez was struggling to get away from defendant. Ms. Vasquez pleaded for the officers to help her. She said: "Help me, help me. Let me go." Defendant said multiple times, "Tell them I didn't do anything." Officer Tallakson repeatedly ordered defendant to release Ms. Vasquez. Defendant did not comply. The two officers attempted to pull defendant off Ms. Vasquez.

Officer Tallakson described what happened as the struggle ensued: "He whips his head back to look at me and then throws his left arm up at me. [¶] . . . He has closed fist--closed his fist, swung his arm up in my chest and head area because I was bending over." Officer Tallakson radioed for back-up. Defendant grabbed the microphone from Officer Tallakson. The struggle continued as the officers attempted to restrain defendant and Ms. Vasquez tried to get free. Defendant grabbed Officer Tallakson's radio. Defendant tucked the radio under his waist and lay face down on the bed. As the struggle ensued, Officer Dantzler placed a second radio call for back up. Defendant then reached up and knocked the radio out of Officer Dantzler's hand. Eventually, with the help of two additional officers, Officers Tallakson and Dantzler gained control of defendant.

Officer Tallakson spoke with Ms. Vasquez later that evening. She was distraught, crying and complaining of pain. She said defendant had held her down and would not let her go. Officer Tallakson did not see any injuries on Ms. Vasquez.

On April 2, 2014, eleven days prior to the present incident, Officer Alan Coleman and a partner were present near Ms. Vasquez's apartment building. Officer Coleman saw defendant on top of Ms. Vasquez. The two were struggling. Ms. Vasquez was calling for help. Defendant was on top of Ms. Vasquez on the sidewalk straddling her upper body. Defendant's arms were on top of Ms. Vasquez's arms. As Officer Coleman exited his police car, Ms. Vasquez broke free and ran toward him. Ms. Vasquez appeared to be injured. Ms. Vasquez told Officer Coleman: she had a physical fight with defendant

4

inside her apartment; defendant was angry and grabbed at her neck; she broke free and ran outside; and defendant chased her and tackled her to the ground.

## III.  DISCUSSION

[Parts III(A)-(E) are deleted from publication.  See *post*, at page 10 where publication is to resume.]

## A.  Defendant's Discovery Motion

Defendant filed a pre-trial discovery motion pursuant to *Vela v. Superior Court* (1989) 208 Cal.App.3d 141, 150 (*Vela*), a decision of Division Three of this appellate district.  (See *People v. Petronella* (2013) 218 Cal.App.4th 945, 960.)  In *Vela,* an officer-involved shooting led to attempted murder charges being filed against two defendants.  The two police officers involved in the altercation subsequently gave statements to a special investigation team.  The statements were intended for use in the defense of any civil litigation.  The two defendants then sought disclosure of the officers' statements.  The Court of Appeal held a public entity is entitled to assert the attorney-client privilege over police officer statements given to internal investigators for use in defense of possible civil action.  (*Vela, supra,* 208 Cal.App.3d at p. 150; see *People v. Petronella, supra,* 218 Cal.App.4th at p. 960.)  The Court of Appeal further held such privileged statements are subject to discovery by a defendant when necessary to protect his or her confrontation and cross examination rights.  Our Division Three colleagues explained:  "Here, the City seeks to protect from disclosure written statements of the very police officers whose trial testimony will be necessary to prove the criminal charges filed against the defendants.  In such circumstances, adherence to a statutory attorney-client privilege must give way to pretrial access when it would deprive a defendant of his constitutional rights of confrontation and cross-examination.  Whether this is in fact the case is an issue which must be resolved by the trial court.  To preserve [a city's] claim of [attorney-client] privilege pending such resolution, declarations and other supporting evidence may be

5

submitted to the trial court, at the time of any discovery motion or hearing upon a subpoena duces tecum, for in camera examination.  The court may then decide if the claim of attorney-client confidentiality should be sustained over the criminal defendant's discovery request and, if so, to what extent.  [Citations.]"  (*Vela, supra,* 218 Cal.App.3d at pp. 150-151; but see *People v. Petronella, supra,* 218 Cal.App.4th at p. 960 [questioning *Vela* in light of subsequent California Supreme Court decisions].)

We assume for purposes of discussion that *Vela* was correctly decided.  Here, defendant sought the statements of Officers Tallakson and Dantzler and an individual identified only as Sergeant R. Madrid made during any internal departmental use of force investigation.  Deputy Public Defender Nima Farhadi did not know whether there had been a use of force investigation by the Los Angeles Police Department with respect to defendant's case.  Deputy City Attorney Neil Blumenkopf represented the Los Angeles Police Department at the hearing.  The trial court inquired of Mr. Blumenkopf whether he knew of any such investigation.  Mr. Blumenkopf responded:  "I don't know.  This is evidence [Mr. Farhadi] would obtain through the normal discovery process from the prosecution, not from . . . the city attorney's office."  The trial court ordered Deputy District Attorney Sherry Powell "to make all reasonable inquiry" as to any internal use of force investigation and to "provide all that material to" Mr. Farhadi.  The trial court denied defendant's motion because the requested information would be turned over by the prosecution through the normal discovery procedure.  Mr. Farhadi did not object to the trial court's order.  Therefore, the issue has been forfeited.  (Evid. Code, § 353; *People v. Collie* (1981) 30 Cal.3d 43, 49 [failure to object to discovery order on ground raised on appeal]; see generally, e.g., *People v. Hajek* (2014) 58 Cal.4th 1144, 1206, 1208; *People v. Seijas* (2005) 36 Cal.4th 291, 301.)  Nor did Mr. Farhadi renew his motion.  And there is no evidence Mr. Farhadi attempted to subpoena any relevant documents from the Los Angeles Police Department.  If Mr. Farhadi did make an effort to subpoena relevant documents from the Los Angeles Police Department, there is no evidence his efforts were unsuccessful.  As a result, there is no indication any internal use

6

of force investigation occurred and no showing of any potential violation of defendant's confrontation or cross-examination rights.

### B. Defendant's Peace Officer Personnel Records Disclosure Motion

Defendant has requested that we independently review the sealed record of the trial court's in camera hearing for review of peace officer personnel records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232; *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 537-538.) The trial court found two complaints as to one of the officers responsive to defendant's motion and ordered that they be turned over to the defense. We have reviewed the transcript of the trial court's July 17, 2014 in camera hearing. No abuse of discretion occurred. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Mooc, supra,* 26 Cal.4th at pp. 1228, 1232.)

### C. Jury Instruction Describing Uncharged Domestic Violence as False Imprisonment

Defendant asserts it was prejudicial error to instruct the jury the prior domestic violence incident was "false imprisonment." With respect to false imprisonment, the jury was instructed: "The defendant is charged in Count 1 with false imprisonment by violence or menace in violation of Penal Code section 236. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intentionally and unlawfully (restrained,/ or confined,/ or detained) someone by violence or menace; [¶] AND [¶] 2. The defendant made the other person stay or go somewhere against that person's will. [¶] Violence means using physical force that is greater than the force reasonably necessary to restrain someone. [¶] Menace means a verbal or physical threat of harm. The threat of harm may be express or implied. [¶] An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act. [¶] False imprisonment does not require that the person restrained be confined in jail or

7

prison." This was a correct statement of the law and defendant does not contend otherwise. (*People v. Agnew* (1940) 16 Cal.2d 655, 659-660; *People v. Ross* (1988) 205 Cal.App.3d 1548, 1553-1554.) With respect to the prior domestic violence incident, the trial court further instructed the jury: "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: *false imprisonment* on April 2, 2014." (Italics added.)

We review the instruction de novo in assessing whether it correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Berryman* (1993) 6 Cal.4th 1048, 1089, disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) We find no error. There is strong evidence the prior domestic violence incident amounted to false imprisonment. Officer Coleman testified: defendant was on top of Ms. Vasquez on the sidewalk; defendant was straddling Ms. Vasquez's upper body; defendant's arms were on top of Ms. Vasquez's arms; and Ms. Vasquez was struggling and calling for help. Ms. Vasquez told Officer Coleman defendant had chased her and tackled her to the ground.

Further, we review instructional error claims for prejudice, that is, whether it is reasonably probable the result would have been more favorable to defendant had the error not occurred. (*People v. Gamache* (2010) 48 Cal.4th 347, 376; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101.) We conclude that even if the trial court erred, it is not reasonably probable the verdict would have been more favorable to defendant absent the error. Strong evidence supported the misdemeanor false imprisonment and resisting charges. Officer Tallakson and Ms. Gonzales both testified defendant physically restrained Ms. Vasquez. Both prosecution witnesses testified defendant would not release Ms. Vasquez while she struggled to break free. Officer Tallakson further testified: defendant ignored his commands to release Ms. Vasquez; defendant actively resisted the officers; a prolonged struggled preceded defendant's arrest; and the arrest was accomplished only after a total of four officers were engaged in the effort to restrain defendant.

8

### D. The Count 1 Sentence

Defendant was convicted of misdemeanor false imprisonment, a lesser included offense of the felony false imprisonment charged in count 1. The potential sentence for misdemeanor false imprisonment was up to one year in the county jail. (§ 237, subd. (a).) The trial court ordered, "[A]s to count one[,] the misdemeanor, [defendant's] given county jail of six months, 180 days, but that's to run concurrent with count two." The abstract of judgment reflects a concurrent *one-year* sentence on count 1. The parties also refer to the sentence imposed as a *one-year* sentence. We asked the parties to brief the question whether the trial court imposed a concurrent 180-day sentence rather than a 1-year term. We conclude the trial court's clear intent was to impose a concurrent 180-day sentence. The abstract of judgment will be amended to so reflect. In addition, section 8 of the abstract of judgment erroneously refers to the misdemeanor false imprisonment conviction, count 1, as count 2: "**CT. 2**-236 PC, MISD: DEFT TO SERVE 1 YR IN L.A. COUNTY JAIL TO RUN CONNCURRENT W/CT. 2." (Emphasis added.) The abstract of judgment must be corrected to refer to "CT. 1-236 PC, . . . ."

### E. Assessments

The trial court ordered, "A $40 court operations fee and a $30 court facility fee is imposed under mandatory state law." The trial court should have imposed the court operations and court facilities assessments as to *each count* for a total of $80 under section 1465.8, subdivision (a)(1), and $60 under Government Code section 70373, subdivision (a)(1). (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484-485; see *People v. Alford* (2007) 42 Cal.4th 749, 758, fn. 6.) The judgment must be modified and the abstract of judgment amended to so provide.

9

[The balance of the opinion is to be published.]

## F. No Revocation Restitution Fine Could Be Imposed

Defendant committed his misdemeanor and felony violations on April 13, 2014 and was sentenced on September 4, 2014. Defendant was sentenced to county jail for two years. As to count 1, defendant received a six month concurrent county jail sentence for misdemeanor false imprisonment. As to count 2, he was sentenced to the middle term of two years on the felony section 69 resisting an executive officer charge. No part of the felony sentence was suspended as permitted by section 1170, subdivision (h)(5)(B).

The trial court orally imposed a $300 section 1202.4, subdivision (b)(1) restitution fine. The trial court also orally imposed and stayed a $300 section 1202.45 revocation restitution fine. We conclude no section 1202.45 revocation restitution fine could be imposed.

There are two relevant provisions in section 1202.45. Section 1202.45, subdivision (a), which permits the imposition and stay of a parole revocation restitution fine states, "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." No parole revocation restitution fine can be imposed and stayed in this case. Defendant was not sentenced to prison and, as a matter of law, is not subject to a period of parole supervision. (*People v. Armogeda* (2015) 233 Cal.App.4th 428, 434; *People v. Jones* (2014) 231 Cal.App.4th 1257, 1266; *People v. Cruz* (2012) 207 Cal.App.4th 664, 671-672.) Because he was sentenced to county jail, the Department of Corrections and Rehabilitation has no jurisdiction over defendant. (*People v. Espinoza* (2014) 226 Cal.App.4th 635, 639.) Section 1202.45, subdivision (a) does not apply to this case.

The second relevant provision is section 1202.45, subdivision (b) which states in part, "In every case where a person is convicted of a crime and is subject to either

10

postrelease community supervision under Section 3451 or mandatory supervision under subparagraph (B) of paragraph (5) of subdivision (h) of Section 1170, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional postrelease community supervision revocation restitution fine or mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. . . ." Section 1202.45, subdivision (b) identifies two revocation restitution fines that may be imposed. To begin with, an accused who is subject to section 3451 post-release community supervision may be subject to a revocation restitution fine. However, section 3451, subdivision (a), by its very terms, relates only to inmates released from prison.[2] (See *People v. Cruz, supra,* 207 Cal.App.4th at pp. 672-673, fn. 8.) As defendant was sentenced to county jail and not prison, the trial court could not impose a postrelease community supervision revocation restitution fine.

Section 1170, subdivision (h)(5) specifies how a trial court is to proceed when a county jail sentence is imposed and a period of mandatory supervision is imposed: "(A) Unless the court finds that, in the interests of justice, it is not appropriate in a particular case, the court, when imposing a sentence pursuant to paragraph (1) or (2), shall suspend execution of a concluding portion of the term for a period selected at the court's discretion." If the trial court suspends a portion of the term it selected (in this case two years for the resisting an executive officer charge), then the following is to occur: "(B)

---

[2]    Section 3451, subdivision (a) states, "Notwithstanding any other law and except for persons serving a prison term for any crime described in subdivision (b), *all persons released from prison on and after October 1, 2011, or, whose sentence has been deemed served pursuant to Section 2900.5 after serving a prison term for a felony shall, upon release from prison* and for a period not exceeding three years immediately following release, be subject to community supervision provided by a county agency designated by each county's board of supervisors which is consistent with evidence-based practices, including, but not limited to, supervision policies, procedures, programs, and practices demonstrated by scientific research to reduce recidivism among individuals under postrelease supervision." (Italics added.)

11

The portion of a defendant's sentenced term that is suspended pursuant to this paragraph shall be known as mandatory supervision, and, unless otherwise ordered by the court, shall commence upon release from physical custody or an alternative custody program, whichever is later.  During the period of mandatory supervision, the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation, for the remaining unserved portion of the sentence imposed by the court.  The period of supervision shall be mandatory, and may not be earlier terminated except by court order." (§ 1170, subd. (h)(5)(B).)

Hence, when a portion of the term is suspended, a period of mandatory supervision ensues unless the trial court orders otherwise because the interests of justice so dictate.  This is referred to as a blended, hybrid or split sentence and it consists of a county jail term followed by a period of mandatory supervision.  (*People v. Camp* (2015) 233 Cal.App.4th 461, 467 [hybrid or split sentence]; *People v. Catalan* (2014) 228 Cal.App.4th 173, 178 [hybrid or split sentence]; *People v. Prescott* (2013) 213 Cal.App.4th 1473, 1478, fn. 2 [split or blended sentence]; *People v. Cruz, supra,* 207 Cal.App.4th at pp. 671-672 [hybrid sentence].)  Here, the trial court never suspended any portion of the two-year county jail term and no period of mandatory supervision was imposed upon defendant.  Accordingly, no mandatory supervision revocation restitution fine could be imposed.  Section 1202.45, subdivision (b) only permits imposition of a revocation restitution fine when there is a term of postrelease community or mandatory supervision; neither of which occurred in our case.  Thus, the order imposing a section 1202.45 revocation restitution fine is reversed.  Once the remittitur issues, the abstract of judgment is to be corrected to remove any reference to the revocation fine.

## IV.  DISPOSITION

The judgment is modified:  to impose $80 in court operations assessments (Pen. Code, § 1465.8, subd. (a)(1)); to impose $60 in court facilities assessments (Gov. Code, § 70373, subd. (a)(1)); and to delete any reference to a revocation restitution fine of any kind (Pen. Code, § 1202.45, subds. (a)-(b)).  The judgment is affirmed in all other respects.  Upon remittitur issuance, the clerk of the superior court is to amend the abstract of judgment to reflect:  $80 in court operations assessments (Pen. Code, § 1465.8, subd. (a)(1)) and $60 in court facilities assessments (Gov. Code, § 70373, subd. (a)(1)); that a concurrent 180-day sentence was imposed on count 1; no revocation restitution fine of any type has been imposed; and to correct section 8 to read "CT. 1-236 PC, MISD: . . . ." instead of "CT. 2-236 PC, MISD. . . . ."

CERTIFIED FOR PARTIAL PUBLICATION



TURNER, P.J.

We concur:



KRIEGLER, J.



BAKER, J.

13