Filed 9/13/22  P. v. Wu CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093952 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F06529) |
| v. | |
| FUMEEI NIKKO WU, | |
| Defendant and Appellant. | |

Defendant Fumeei Nikko Wu, owner and operator of a brewery in Nevada City, The Old Brewery, was charged with 18 counts of violating various provisions of the Unemployment Insurance Code in connection with avoiding the payment of payroll taxes. She entered a plea of no contest to five counts.[1]  The trial court suspended

---

[1]    Specifically, defendant pleaded no contest to violating sections 2101.5, 2106, 2108, 2117.5, and 2118.5 of the Unemployment Insurance Code. As relevant here, these sections make it a crime to "willfully make a false statement or representation" to the Employment Development Department (EDD) "for the purpose of lowering or avoiding

1

imposition of sentence and placed defendant on formal probation for a period of five years subject to various terms and conditions. Thereafter, two victim restitution hearings were held. The first resulted in a restitution order in the amount of $46,255.97 plus investigation costs. The second resulted in a substantial reduction in that amount, $7,849.88 plus investigation costs.

Defendant appeals from the second restitution order. As we discuss in some detail below, her briefing raises a number of issues and subissues in a disorganized and disjointed fashion. We discern two primary contentions: (1) the trial court violated defendant's federal constitutional right of confrontation by preventing her trial attorney from impeaching EDD auditor Barbara Zelny with certain alleged auditorial misconduct, three instances of alleged perjury, and an alleged violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*); and (2) the trial court abused its discretion in awarding restitution because (a) it relied on Zelny's audit report, which applied the wrong burden of proof, and (b) there is no factual and rational basis for the amount awarded. We disagree with each contention and affirm the restitution order.

BACKGROUND

The underlying facts of defendant's payroll tax evasion are not relevant to the contentions raised in this appeal and will not be recounted, except to note that while operating The Old Brewery between 2011 and 2014, defendant underrepresented the amount of wages paid to her employees for the purpose of lowering her required tax contributions and failed to submit various quarterly reports to EDD.

---

any contribution" (Unemp. Ins. Code, § 2101.5), "willfully and unlawfully fail or neglect to furnish" certain reports to EDD (*id*., § 2106), "willfully fail or refuse to make any contributions which are due" (*id*., § 2108), "willfully fail[ ] to file any return or report . . . with intent to evade any tax imposed by this code" (*id*., § 2117.5), and "willfully fail[ ] to collect or truthfully account for and pay over" taxes "required by this code" to be collected, accounted for, and paid over (*id*., § 2118.5).

2

*First Restitution Hearing*

As previously mentioned, there were two restitution hearings in this case. This appeal is from the restitution order entered following the second hearing. We therefore need not recite the testimony adduced during the first hearing in any detail. We provide only what is necessary to place the contentions raised in this appeal in their proper context.

The first restitution hearing was held in March 2017. EDD auditor Barbara Zelny testified that The Old Brewery, a limited liability company (LLC), was being operated as an S corporation, making defendant, the LLC's managing member, an employee of the company and requiring the company to pay payroll taxes on her wages. Zelny testified that she made this determination based on her review of two documents, an application for a loan from Wells Fargo Bank that indicated The Old Brewery was an S corporation, and a DE 1 (Commercial Employer Account Registration and Update Form) submitted to EDD on which defendant checked boxes for both "LLC and also corporation." When the prosecutor asked Zelny whether she could have reviewed any records from the Internal Revenue Service (IRS) or the Franchise Tax Board (FTB) that would have indicated "defendant was making an election as to whether or not she was operating as an S corp," Zelny answered: "There is an IRS form IRA 32[2] that the employers can send to IRS, but we don't have access to that information."

---

**2**     As defendant correctly observes, there is no IRS form IRA 32. This appears to be a transcription error. It is possible that Zelny said form 8832, which is the form an entity uses to elect to be classified for federal tax purposes as either a corporation, a partnership, or an entity electing to be disregarded as a separate entity. (Internal Revenue Service, Dept. of the Treasury, Form 8832 (rev. Dec. 2013) <https://www.irs.gov/pub/irs-pdf/f8832.pdf> [as of Sept. 9, 2022], archived at <https://perma.cc/RLL7-XDLM>.) However, as defendant also observes, the form used for making an S corporation election is form 2553. (Internal Revenue Service, Dept. of the Treasury, Form 2553 (rev. Dec. 2017) <https://www.irs.gov/pub/irs-pdf/f2553.pdf> [as of Sept. 9, 2022], archived at <https://perma.cc/6N38-MWV6>.)

After hearing this testimony, and argument from counsel, as well as reviewing the parties' briefing on the restitution issue, the trial court ordered defendant to pay victim restitution in the amount of $46,255.97 plus investigation costs. About 74 percent of this amount was based on Zelny's conclusion that The Old Brewery was operating as an S corporation for tax purposes.

### *Zelny's Subsequent Testimony*

In September 2018, Zelny testified before the California Unemployment Insurance Appeals Board (CUIAB) regarding defendant's tax liability. When asked by defendant's new attorney about how a company becomes an S corporation, Zelny answered: "They elect to be S corporation with IRS." In response to follow-up questioning, Zelny testified that she had "[r]ecently" become familiar with IRS form 2553, the form used to make such an election. Zelny then testified that she based her initial conclusion that The Old Brewery was operating as an S corporation on the Wells Fargo loan application, but acknowledged there were "quite a few" other loan applications that did not indicate that an S corporation election had been made. Defendant's counsel asked: "So, you ignored all the others that didn't have that designation even though the box was there, and you pinned this S corporation status on one application, is that correct?" Zelny answered: "Yes." Zelny acknowledged that since the original audit and restitution hearing, she had determined The Old Brewery was in fact not being operated as an S corporation for tax purposes. Finally, Zelny was asked whether she was aware of an information sharing agreement between EDD and the IRS. She testified that she was aware of that agreement and had used it in the past, but did not do so during her audit of The Old Brewery because she "was not the original auditor," but rather took over the audit from someone else.

Based on this new conclusion, EDD issued a notice of adjustment reducing the assessment from $46,255.97 to $12,210.48.

4

***Various Challenges to the First Restitution Order***

In November and December 2019, defendant filed a petition to reduce the restitution order and set aside the initial audit due to misconduct, a motion to recuse the prosecutor, also for misconduct, and a motion to exclude specific items from the restitution order.

As relevant here, defendant argued that the prosecution cherry-picked a single piece of evidence, the Wells Fargo loan application, to support its conclusion that The Old Brewery was operating as an S corporation for tax purposes, ignored several other loan applications supporting a contrary conclusion, and did so even though Zelny was aware she could have obtained information from the IRS conclusively resolving the matter.[3] Defendant also argued, in a supplemental brief, that Zelny committed perjury during the first restitution hearing and that the prosecution violated *Brady* by failing "to disclose the 'quite a few' exculpatory bank applications" other than by "dump[ing] thousands of documents and records" on defendant's attorney, "virtually all image files," and therefore, "not word searchable."

Finally, in the motion to exclude specific items, defendant argued that "the methodology adopted by the EDD in its audit of [The Old Brewery] was to include every check made to each and every individual from eight bank accounts," resulting in an

---

[3]    As mentioned previously, Zelny also based her S corporation conclusion during the first restitution hearing on a DE 1 form submitted to EDD with checked boxes for both corporation and LLC.  Defendant argued this form was obviously incorrectly filled out, but more importantly, not relevant to the S corporation issue, but the prosecution submitted it to the court as evidence of such an election anyway.  Defendant additionally took issue with another item of evidence submitted by the prosecution in support of there having been an S corporation election, The Old Brewery's registration with the Secretary of State.  However, because Zelny stated during her testimony at the first restitution hearing that this registration did not provide her with any "insight as to whether the defendant was operating [T]he Old Brewery as an S corp," we declined to mention it during our summary of that hearing, and shall mention it no further.

unreasonable ratio of "assessed wages [being] around 80% of revenue," which amounted to "over two and one-half times the industry average" for a wages-to-revenue ratio. Acknowledging that an audit is generally presumed to be correct, defendant argued this presumption does not apply where an audit's result is unreasonable. In such a case, defendant argued, "the burden shifts to the State to present prima facie evidence with respect to each item in the audit." Defendant then specifically set forth individual items of alleged wages that she contested.

In response to defendant's multifarious attack on the original restitution order, the prosecution filed a request that the court make specific findings that the prosecutor did not engage in misconduct or violate *Brady*, an opposition to defendant's petition to reduce the restitution order, and an opposition to defendant's recusal motion. Rebuttal briefing was thereafter filed by defendant.

In February 2020, at a status conference regarding the above-described motions, defendant's counsel began by arguing "three instances of perjury by [Zelny]" during the first restitution hearing amounted to "a due process violation," and therefore, "the original hearing should be set aside." The trial court expressed concern that this was not the proper vehicle for challenging alleged perjury at the original hearing, but ultimately asked defense counsel to submit a written offer of proof delineating the expected testimony of the witnesses he would be offering at a second restitution hearing and indicated the matter would be continued to allow the court to review that document. At the end of the status conference, the prosecution offered to stipulate to the fact that there was no S corporation election made by The Old Brewery.

The requested offer of proof was filed in March 2020. We describe its contents during the discussion portion of this opinion. The prosecution filed a response the following month. The trial court then issued a tentative decision reducing the restitution order from $46,255.97 to $12,210.48.

6

A hearing on the tentative decision was held in July 2020. At the hearing, defendant's counsel informed the trial court that EDD had further adjusted the assessment to the amount of $10,568. However, defendant was not willing to stipulate to that sum, but rather believed the correct amount "should be around $4,200." With respect to this claimed amount, the trial court asked the prosecution for comment. The prosecutor indicated that she had not seen a number of documents defendant's counsel apparently submitted to EDD to reduce the tax liability to around $10,000, but "it is EDD's position that the $10,000 tax liability is accurate at this point." The prosecutor also indicated that the number could be further modified downward based on additional evidence, but she had not seen any evidence justifying a lesser amount. The trial court asked defense counsel whether the prosecution had the documentation defendant was relying on. Counsel responded: "No, they don't." After the trial court suggested it might be "smart" to provide the prosecution with those documents, counsel agreed to do so. The matter was continued to allow the prosecution to consider any new evidence.

### Second Restitution Hearing

The second restitution hearing was held in November 2020. Defendant's counsel called Mihai Algiu, The Old Brewery's general manager and booking coordinator, for the primary purpose of establishing that he was an independent contractor rather than an employee of the company. Algiu also testified that music producers who brought bands to play at the venue were responsible for overseeing and paying security staff from the money they made at the door, although Algiu and defendant would sometimes direct where security were to be positioned during shows. During cross-examination, the prosecutor elicited testimony supporting a conclusion that Algiu was in fact an employee of The Old Brewery, notwithstanding the independent contractor agreement he signed.

Defendant's counsel also called Joanna Duncan, who worked at The Old Brewery for about a year as a bartender and occasionally as security for live music events. Most of the time, Duncan received her pay from defendant in the form of a check, but would

7

occasionally be paid cash out of the cashbox at the end of her shift. Duncan confirmed that music producers were responsible for paying security staff during live music events. Duncan further testified that the point of sale (POS) system that she and other employees used to clock in and out was notoriously unreliable because employees would often forget to clock out at the end of their shifts. Because of this, Duncan would keep track of her hours manually and send defendant a text message with the hours she actually worked. She advised other employees to do the same.

The prosecution then called Zelny. After providing an overview of the various taxes collected by EDD, and the general audit process, Zelny explained that one of her duties during an audit is to determine whether various checks made out to certain individuals are "for wages or for another purpose, such as an expense reimbursement." She explained: "If I'm seeing the check that is issued to the reimbursement, I want to see the backup for that reimbursement. So it could be the receipt that's going to match that reimbursement check." For checks purporting to be for loan repayment, Zelny wanted to see a loan agreement. Otherwise, she would designate the check as having been paid for services rendered. Zelny also testified that another duty she had during an audit was to determine whether an individual who received payment for services was an employee or an independent contractor. She received training to be able to make this determination and used a number of factors to do so. One of these factors was whether the person had signed an independent contractor agreement, but this alone was not sufficient.

Turning to Zelny's audit of The Old Brewery, she testified that she received various documents from her investigator, including bank statements, canceled checks, and e-mail correspondence, and designated "workers that [she] found questionable" as employees of The Old Brewery. After inputting payments made to these individuals into audit software that calculated the taxes due, Zelny issued a proposed notice of assessment in the amount of "about $46,000" in January 2016. In March 2017, after the first restitution hearing, a final notice of assessment in about the same amount was issued. In

8

August 2018, a notice of adjustment was issued reducing the assessment to about $12,000 after EDD received information from the IRS that The Old Brewery had not made an S corporation election. A further notice of adjustment was issued in June 2020 after EDD received a binder from defendant's attorney containing evidence that some items were "duplicate payments," as well as evidence supporting a conclusion that certain individuals were independent contractors and certain expenses were not for services. Finally, after the July 2020 hearing, defendant's attorney provided additional documentation to EDD, resulting in a final notice of adjustment in the amount of $8,981.57 being issued in October 2020.[4]

With respect to the testimony of defendant's witnesses at the second restitution hearing, Zelny stated further adjustment of the assessment was not warranted due to "how security was being run and paid" because Zelny viewed security as a part of defendant's "business model," defendant's staff were the ones acting as security, defendant often paid staff for their security work, sometimes with a check that "clearly said security," and defendant was also "involved" in overseeing the security. Thus, for example, Zelny included all checks made out to Duncan regardless of whether she was bartending or working security on a particular shift. When Zelny testified that she used the "POS amounts" for Duncan's hours, defendant's attorney offered to stipulate that Duncan was an employee, but stated he was challenging "the entries from the POS system and checks which specifically state that they're reimbursement." The trial court accepted the

---

[4]     Zelny also testified to an additional "estimated assessment" in the amount of $2,429.45 that was generated by her system that was also owed by The Old Brewery for the relevant time period, bringing the total to $11,411.02. However, the trial court excluded this amount because the prosecution did not offer any evidence that this amount was due, other than Zelny's testimony that this amount was " 'generated on the system.' " We mention it no further.

9

stipulation and indicated that counsel could cross-examine Zelny regarding the other matters.

Because certain evidentiary rulings made during defense counsel's cross-examination of Zelny, and during his direct examination of defendant's tax expert, are challenged in defendant's first claim on appeal, we defer describing these examinations until our discussion of that claim.

We finally note that all checks made out to individuals Zelny determined to be employees of The Old Brewery were included in an exhibit that was admitted into evidence.

### *The Trial Court's Ruling*

The trial court ordered victim restitution in the amount of $7,849.88. The trial court explained that the prosecution made a prima facie showing of loss, shifting the burden to defendant to establish the amount of the loss was incorrect. After summarizing the evidence adduced during the second restitution hearing, the trial court concluded none of defendant's evidence established that the amounts paid to the various individuals were not wages paid to employees. However, the trial court also found Zelny's reliance on the POS system to estimate wages was not reliable and excluded those estimated wages from the order.

This appeal followed.

### DISCUSSION

### I

### *Confrontation Claim*

As a preliminary matter, we note that under the heading "Denial of Opportunity to Impeach State's Witness," referring to Zelny, defendant does not actually argue she was denied the opportunity to impeach Zelny. Instead, defendant argues that Zelny based her conclusion that The Old Brewery was being operated as an S corporation on one bank application while ignoring other evidence to the contrary, and her trial attorney offered to

10

prove this amounted to "auditorial misconduct" and that Zelny violated *Brady* and committed perjury during the initial restitution hearing. Then, under two separate headings, defendant argues *Brady* was in fact violated and Zelny did in fact commit three acts of perjury. Finally, under two new headings, "Court's Denial of Opportunity to Confront Ms. Zelny and Impeach Her" and "Petitioner's Right to Confront Ms. Zelny – Sixth Amendment," defendant argues that a confrontation violation occurred.

This somewhat strange structure suggests that defendant's assertions of perjury and violation of *Brady* are being made in the context of, and as the foundation for, her confrontation claim, rather than separate and independent contentions. In other words, before arguing that defendant's confrontation rights were violated by the trial court's limitation of her cross-examination of Zelny concerning the alleged perjury and *Brady* violation, defendant first sought to establish the basis for the desired cross-examination. Defendant acknowledges as much with respect to the alleged *Brady* violation. We therefore need not address these perjury and *Brady* issues except as they relate to the overarching confrontation claim. In that context, we need not reach the merits of either underlying contention. As we explain below, defendant's confrontation claim fails for a completely independent reason.

### A.

#### *Additional Background*

As mentioned, a written offer of proof was filed by defendant's counsel with respect to the witnesses he intended to call at the second restitution hearing. With respect to Zelny, the offer of proof alleged she committed perjury by (1) testifying that she did not have access to IRS information regarding whether or not The Old Brewery made an S corporation election; (2) testifying that she determined The Old Brewery was being operated as an S corporation in part because defendant designated herself as president and only a corporation may have a president; and (3) testifying that her S corporation determination was based in part on defendant choosing " 'S corporation' " on the DE 1

11

form when there was no such choice on the form. Defendant's counsel proposed asking Zelny various questions concerning these alleged instances of perjury, arguing such questioning was "relevant as to whether the original restitution hearing was fundamentally unfair and whether [defendant's] right to Due Process was violated." Defendant's counsel also proposed asking Zelny questions regarding the various bank loan applications that did not indicate an S corporation election had been made as relevant to establish a *Brady* violation occurred.

At the subsequent hearing regarding the tentative decision reducing the restitution order from $46,255.97 to $12,210.48, defendant's counsel argued the tentative decision failed to address whether a tax audit is entitled to a presumption of correctness "when the tax auditor commits perjury, ignores evidence and hides that evidence." According to counsel, such a presumption "disappears" not only because of "the State's misconduct in this case," but also because of the 80 percent wages-to-revenue ratio noted previously. The trial court indicated it did not want to relitigate the first restitution hearing, and instead was "interested in . . . making sure the amount of restitution is fair to both sides." The trial court also agreed with counsel that the original amount was wrong, and then stated: "So whether someone perjured themselves, or whatever, doesn't help me find out what amount of restitution she should pay." Counsel then stated he was "only mentioning the perjury because it undermines the presumption of correctness." The trial court stated: "That ship has sailed." Counsel responded: "Okay, fine. Great."

At the close of this hearing, after further argument regarding whether there was a *Brady* violation or misconduct on the part of the prosecutor for subornation of perjury, defendant's counsel asked the trial court to specifically rule as to whether or not Zelny committed perjury. The trial court responded: "I don't have enough information to know whether there was, A, perjury; B, [the prosecutor] knew it was perjury. So I'm not going to rule whether it was perjury or not, because I don't know."

12

After the hearing on the tentative decision, defendant filed additional motions and briefing. As relevant here, defendant asked the trial court to allow the second restitution hearing "to proceed for the sole purpose of conclusively impeaching Barbara Zelny." Defendant also asked the trial court to "either recuse Ms. Zelny and exclude her from further participation in the audit or put her on the witness stand for the sole purpose of impeaching her."

During the second restitution hearing, defendant's counsel asked Zelny why she included payments in the tax assessment unless she had documentation showing the payment was *not* for wages. Zelny explained that a certain regulation placed the burden of proof on the employer. Counsel then asked whether she "learn[ed] at any time . . . that the burden of proof was actually on the State." When she answered "[n]o," counsel had her read a statement made by the judge who presided over the initial restitution hearing, specifically that "the People have the burden of proceeding and establishing a restitution amount . . . ."

The trial court asked counsel to explain the relevance of this line of inquiry. Counsel responded, "she just testified she relied on the burden of proof being on the employer, and she received an instruction as she took the stand that the burden of proof was on the People." The trial court stated: "You're mixing apples and oranges. [¶] The way I understand it is, during the audit . . . the burden of proof, once there's an item that's deemed questionable, then it shifts to the employer to provide documentation why it shouldn't be questionable. [¶] In a restitution hearing post-conviction, it is then on the Prosecution to show, in terms of restitution, what she has to pay to the State is on the People. I don't see a connection." In response, counsel argued that Zelny's presentation of an audit that was based on a different burden of proof than that utilized by the trial court at the initial restitution hearing went to her "lack of credibility" and "bias." The trial court repeated, "you're mixing apples and oranges," and instructed counsel to "move on."

13

In response to an objection from the prosecutor following a line of questioning regarding the structure of The Old Brewery, defendant's attorney again brought up the fact that Zelny initially concluded the company was being operated as an S corporation, called this conclusion "outrageous," and argued, "again, it goes to credibility and bias." The trial court responded: "Her conduct, whether you find it outrageous, or otherwise, does not get me to a dollar amount." Questioning continued along these lines, drawing further objections, which were sustained. However, the trial court allowed defendant's attorney to make an offer of proof on the record. This verbal offer of proof repeated the assertions made in the written offer of proof and in many of defendant's trial court filings. The trial court again ruled the proffered line of questioning would not be allowed.

Defendant called her own tax expert, Edward Conger. Defendant's counsel began by asking him about how a company makes an S corporation election, which drew a relevance objection because that issue had already been conceded. Counsel responded that this line of questioning remained relevant to show Zelny's bias and misconduct in concluding The Old Brewery was being operated as an S corporation. Counsel also pointed out that the trial court had stated that it would not be relying on a presumption of correctness, and argued, "Zelny testified that she was relying on the burden of proof being on the taxpayer, which is the same as the presumption of correctness." The trial court interjected: "What she relies on and what I rely on are two different things." Counsel responded: "But if you -- my position here is, if you include the audit ab initio into this, that audit is based on the presumption of correctness, and, therefore, the Court is relying on the presumption of correctness." The trial court stated: "I'm not. It's an audit. It's a piece of evidence to me; that's all it is. It's some evidence." After further argument regarding Zelny's claimed bias, the trial court urged counsel to focus on asking his expert questions related to the proper amount of restitution to be ordered. The trial court then ruled "this is a collateral issue; it's already been decided; it's already been

14

conceded. [¶] So under [Evidence Code section] 352[,] I'm not going to allow any further testimony based on your proffered evidence."

## B.

### *Analysis*

"Restitution hearings are intended to be informal. ' " 'Section 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property.' [Citations.] ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.] When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount." ' [Citation.]" ' [Citation.] This is invariably a dollars and cents dispute . . . [and] it is up to the defendant ' " 'to demonstrate that the amount of the loss is other than that claimed by the victim,' " ' namely, that the amount claimed is excessive. [Citation.]" (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 684.) Thus, the nature of a restitution hearing limits the scope of a criminal defendant's due process rights: " ' "A defendant's due process rights are protected when the probation report gives notice of the amount of restitution claimed . . . , and the defendant has an opportunity to challenge the figures in the probation report at the sentencing hearing." ' [Citations.]" (*People v. Cain* (2000) 82 Cal.App.4th 81, 86 (*Cain*).)

Similarly, a criminal defendant does not have a state or federal constitutional right of confrontation at a restitution hearing. (*Cain*, *supra*, 82 Cal.App.4th at pp. 86-87.) This is because a restitution hearing "is part and parcel of the sentencing process," (*id.* at p. 87) and "California courts have repeatedly held that the defendant does not have a

15

Sixth Amendment right of confrontation at the sentencing stage of a criminal prosecution." (*Id.* at p. 86, citing *People v. Arbuckle* (1978) 22 Cal.3d 749, 754.)

Defendant argues the trial court, "by accepting Ms. Zelny's audit, while simultaneously limiting cross-examination, . . . made Ms. Zelny unavailable as a witness," and thereby violated the " 'two prong test to determine whether such hearsay evidence violates the confrontation clause of the Sixth Amendment' " set forth in *Ohio v. Roberts* (1980) 448 U.S. 56, abrogated by *Crawford v. Washington* (2004) 541 U.S. 36. This argument fails at the outset for lack of a right of confrontation at the restitution hearing. Defendant did possess a limited due process right to challenge the figures in Zelny's audit and was afforded the opportunity to do so. Indeed, the trial court repeatedly directed counsel to direct his questioning to lowering the restitution amount, at one point stating: "The next question to [Zelny] is going to be how we get down from $11,000, or I'm going to finish -- we're going to end this hearing and end it now." Defendant calls this statement an "admonition in terrorem." Not so. It was designed to focus counsel on what was important to the court, i.e., "what amount of restitution [defendant] should pay."

Defendant also takes issue with the trial court's implicit denial of his motions to allow the second restitution hearing "to proceed for the sole purpose of conclusively impeaching Barbara Zelny," and to "either recuse Ms. Zelny and exclude her from further participation in the audit or put her on the witness stand for the sole purpose of impeaching her." But defendant does not explain how the trial court's decision not to recuse Zelny, or in the alternative, allow her to testify *solely* to allow defendant to impeach her, violated defendant's right of confrontation, a right defendant did not possess at the restitution hearing in any event.

Defendant's right of confrontation was not violated. And to the extent her arguments can be couched in terms of due process, we conclude the limitations the trial court placed on her cross-examination of Zelny and direct examination of Conger did not

16

deprive her of a meaningful opportunity to rebut the prosecution's showing at the second restitution hearing.

## II

### *Purported Abuse of Discretion*

Defendant claims the trial court abused its discretion in awarding restitution because it relied on Zelny's audit report, which applied the wrong burden of proof, and there is no factual and rational basis for the amount awarded. We are not persuaded.

### A.

### *General Legal Principles and Standard of Review*

" '[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.' [Citation.] Restitution must ' "be set in an amount which will fully reimburse the victim for his or her losses unless there are clear and compelling reasons not to do so. . . ." ' [Citations.] ' "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." ' [Citation.]

" 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' " '[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider' " ' in determining victim restitution. [Citations.] Restitution orders are reviewed for abuse of discretion. [Citation.] When there is a factual and rational basis for the amount of restitution ordered, no abuse of discretion will be found. [Citation.]" (*People v. Phu* (2009) 179 Cal.App.4th 280, 283-284.)

"At a restitution hearing, the People carry the initial burden of demonstrating the amount of the victim's economic loss. [Citations.] Their showing establishes the amount of restitution the victim is entitled to receive, and the burden shifts to the defendant to

17

prove by a preponderance of the evidence that the loss is other than that claimed. [Citations.]" (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 788.)

With these general principles in mind, we address and reject each of defendant's arguments in turn.

**B.**

***Reliance on the Audit Report***

Defendant argues the trial court erroneously relied on the audit report, which was prepared "on the assumption that the burden of proof was on the taxpayer," whereas the burden of proof at the restitution hearing "was on the State *ab initio*." We agree, as stated above, that the prosecution had "the initial burden of demonstrating the amount of the victim's economic loss." (*People v. Selivanov*, *supra*, 5 Cal.App.5th at p. 788.) But defendant does not persuade this court that this initial burden cannot be carried by presenting the results of an audit through the testimony of the auditor.

For example, in *People v. Petronella* (2013) 218 Cal.App.4th 945, involving workers' compensation insurance fraud, the prosecution presented, among other things, premium statements based on an audit of the defendant's business conducted by the State Compensation Insurance Fund (SCIF) and two letters from a SCIF underwriting manager (Hogan) summarizing the financial impact of the defendant's fraud and proposing two methods of arriving at the amount of unpaid premiums, one resulting in about $12 million owed to SCIF and the other resulting in about $35 million owed. (*Id*. at p. 965.) The trial court rejected these proposed calculations and ordered $500,000 in restitution. (*Id*. at p. 967.) The appellate court reversed, noting that in addition to the evidence presented at the restitution hearing, an accountant called by the prosecution at trial testified that a comparison of false documents submitted to SCIF and accurate EDD reports indicated the defendant underreported his payroll by over $29 million, leading the jury to return a finding that the fraud resulted in a loss of more than $500,000. (*Id*. at p. 970.) Based on this evidence alone, the court explained that the trial court's "conclusion . . . that the total

18

sum of restitution owed SCIF for defendant's underpayment of premiums was only $500,000 strongly suggests it reached an arbitrary result." (*Ibid.*)

Important for our purposes, the appellate court further explained that the trial court was within its discretion to find Hogan's second proposed method of calculating the loss to be "speculative," but the trial court could not completely disregard the first proposed method simply because administrative regulations required Hogan to use a "modification rating in calculating the unpaid premium, thereby raising the specter defendant 'would be basically given a penalty assessment and . . . the loss of premiums would be in excess of what the actual loss is.' " (*People v. Petronella*, *supra*, 218 Cal.App.4th at p. 971.) Instead, what the trial court should have done is exercise its discretion to "deviate from the regulatory requirements in determining the amount of victim restitution" and thereby "ameliorate the possibility Hogan's calculation would result in a penalty." (*Id*. at pp. 971-972.) We finally note that in response to the trial court's suggestion that Hogan did not do what the trial court thought he should have done to calculate the amount of premiums owed, the appellate court stated: "But Penal Code ' " '[s]ection 1202.4 does not, by its terms, require any particular kind of proof . . . .' [Citations.] ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution." ' " ' [Citation.]" (*Id*. at p. 972.)

For the same reasons, we conclude the trial court was well within its discretion to consider the EDD audit and testimony of Zelny in determining the prosecution had made a prima facie case of loss. Where the trial court concluded certain aspects of the audit findings were speculative, the trial court could, and did, remove them, e.g., the POS estimates. But we cannot conclude the trial court abused its discretion by not rejecting the entire audit simply because regulations place a burden on the employer to provide some evidence that payments are not wages.

## C.

### *Factual and Rational Basis for the Award*

Defendant argues the trial court abused its discretion by not removing from the list of items determined by Zelny to be wages "around $26,000 of items for which no checks were ever written" because there is "no evidence of payment" without a corresponding check number and "no evidence that the amounts are related to services" as opposed to something else. Not so.

Zelny testified that she included these items as wages after reviewing The Old Brewery's bank records, e-mails obtained by search warrant, POS records, and law enforcement interviews with employees. Zelny also testified that various employees stated they were paid in cash, including an employee named Steven Spreadbury, who performed various duties for The Old Brewery, such as cleaning, maintenance, security, cooking, and handyman work. Almost half of the items listed without a corresponding check number were for payments made to Spreadbury. Based on his responses to investigators, Zelny estimated his wages for the relevant time period. A reasonable trier of fact could have found the prosecution carried its initial burden of making a prima facie showing of loss based on wages paid to Spreadbury, and defendant did not carry her subsequent burden of demonstrating by a preponderance of evidence that Spreadbury was not paid these amounts or that he was paid for something other than his services. As to the other items without a corresponding check number, we come to the same conclusion with respect to them.

Defendant next challenges various specific items in Zelny's audit report, divided by employee name, and listing check number and notations made on the respective checks. With respect to most of the items, defendant argues the notation on the check, e.g., "reimbursement bar supplies" written on a check made out to Algiu, provides "evidence that [the payments] are not for services" and therefore, "there is no factual and rational basis for including these payments as wages." Zelny, however, testified that it is

20

fairly common for an employer seeking to avoid payroll taxes to write something other than wages on the memo line of a check in order to disguise wages. Accordingly, she included all checks made out to individuals she determined to be employees unless she was provided with a receipt associated with the check. We conclude it was within the trial court's discretion to adopt Zelny's methodology in this regard and view with distrust the representations made by defendant on the checks in light of the crimes for which she was convicted in this case. Keeping in mind that the trial court is given broad discretion as to the kind of information it may consider in determining the proper amount of restitution, and is " ' "not required to make an order in keeping with the exact amount of loss . . ." ' " (*People v. Phu*, *supra*, 179 Cal.App.4th at p. 283), we cannot conclude the trial court's method of calculating EDD's loss was irrational, arbitrary, or capricious. (*Ibid*.)

Defendant further argues various items should have been excluded because the prosecution did not prove the checks were made out to an employee, as opposed to an independent contractor. As the Attorney General points out, an employer generally bears the burden of establishing that an individual performing services for the employer is an independent contractor rather than an employee. (See *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 957; *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349.) The standard applicable to making this determination depends on the context in which the case arises. (*Dynamex*, at p. 957 [in the wage and hour context, the test is whether "the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact," whether "the worker performs work that is outside the usual course of the hiring entity's business," and whether "the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed"]; *Borello*, at pp. 350-351 [in the workers' compensation context, " '[t]he principal test of an employment relationship is

21

whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired' "; factors relevant to this determination "include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee"].)

This case, of course, arises in the context of ordering victim restitution, in which the prosecution had the initial burden of showing loss. We conclude the prosecution carried this burden with Zelny's testimony that one of her duties during the audit was to determine whether an individual who received payment for services was an employee or an independent contractor. She received training to be able to make this determination and used various factors, including those listed above, to do so. By including the challenged payments in her audit report, Zelny concluded these payments for services were made to employees rather than independent contractors, and therefore defendant's failure to pay the required taxes resulted in loss to EDD. The burden then shifted to defendant to establish by a preponderance of the evidence that an independent contractor relationship in fact existed, and therefore the payments were not wages. Defendant did not come close to carrying this burden.

Defendant more generally argues that the evidence she submitted at the second restitution hearing, including the testimony of Algiu and Duncan, as well as declarations from Duncan and two booking agents, and various documentary evidence, established that security personnel were not employees of The Old Brewery. We have already

22

recounted Zelny's testimony explaining why the testimony of Algiu and Duncan did not persuade her that security personnel were not employees of The Old Brewery. Additionally, one of the individuals defendant claims worked security exclusively, James Wilcox, was routinely paid by defendant with a check, with notations like "5 shifts security 29h" and "36h security 11/16-11/30" made in the memo line. Other individuals were also paid by defendant for their security work, including Erik Trumbly, who told investigators that he worked "security and bar backing," was paid by defendant in cash, " 'under the table,' " for the first four or five months he worked at The Old Brewery, was thereafter paid sometimes in cash and other times with a check, and considered himself an employee. The trial court was well within its discretion to conclude security personnel were employees of The Old Brewery.

Finally, defendant argues that a comparison of her IRS tax returns with EDD's final notice of adjustment demonstrates that adjustment "is still wrong" because her tax returns "report labor costs of 31.7% of revenue," roughly the national average for restaurant labor costs, whereas the notice of adjustment shows wages "that are 59.9% of revenue," roughly "double the national average." We decline to address this argument in any detail because it is based on "evidence" that was not admitted at the restitution hearing. In any event, assuming defendant's tax returns show labor costs in line with the national average and the EDD adjusted assessment shows labor costs roughly twice that, this does not conclusively demonstrate EDD's calculations were incorrect. As the Attorney General correctly observes, "such a high wage to revenue percentage is consistent with a business, like [The Old Brewery], that continually reports losses."

In sum, we conclude the trial court did not abuse its discretion in relying on Zelny's audit and testimony in concluding the prosecution carried its initial burden of showing loss, or in concluding defendant's evidence did not require exclusion of the specific items challenged in this appeal.

## DISPOSITION

The restitution order is affirmed.


_/s/_ _____
HOCH, J.


We concur:


_/s/_ _____
HULL, Acting P. J.


_/s/_ _____
DUARTE, J.